UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MICHAEL LOPORTO,

                Plaintiff,

- against -

COUNTY OF RENSSELAER, YOUEL C. SMITH, III,
also known as and practicing law under the assumed
name of "Trey Smith", individually and in his capacity as
appointed Special District Attorney for the County of Rensselaer;
RICHARD J. McNALLY, JR., individually and in his capacity as
District Attorney for the County of Rensselaer;
WILLIAM A. McINERNEY; JOHN F. BROWN;
DANIEL B. BROWN; and JOHN J. OGDEN, individually
and as investigator for the New York State Police,

                Defendants.

**AFFIDAVIT IN OPPOSITION TO DEFENDANT, RICHARD J. McNALLY JR.'S MOTION TO DISMISS**

Civil Case No.: 1:15-cv-866

---

STATE OF NEW YORK    )
                                ) ss.:
COUNTY OF ALBANY     )

MICHAEL LOPORTO, being duly sworn, deposes and says:

1. I am the plaintiff in the above entitled action. As such, I have knowledge and understanding of the facts and circumstances relevant hereto.

2. I make this affidavit in opposition to the defendant's McNally motion for an Order, pursuant to Federal Rules of Civil Procedure 12(b)(6), dismissing the complaint against him for failure to state a claim upon which relief may be granted, and for such other and further relief as this Court may deem just and proper.

3. It is interesting that the moving defendant's affidavits to support this

1

motion are based on very broad and ill-defined conclusions that McNally did nothing wrong and was not involved in plaintiff's prosecution or the conspiracy against him to protect Democratic operatives, the truly guilty parties, such as defendants McInerney, J. Brown and D. Brown.

4. Interestingly, Special Prosecutor Smith, who was the main participant in not seeking information during his investigation against Democratic operatives which included the moving defendants, was told by Anthony DeFiglio that McInerney and the moving defendants knew of the forgeries. Also, Special Prosecutor Smith purportedly had an affidavit prepared and signed by Joleen Van Vranken as to forgeries on absentee ballots which she then stated under oath that she never signed. Also, there was an expert report to this effect. Yet, Special Prosecutor Smith notarized her signature but was never prosecuted or even investigated as to his participation in Joleen Van Vranken's forged signature on this affidavit. Instead, Smith tried to use this obviously false affidavit against the plaintiff. This is a circumstantial fact, but nevertheless a fact, in support of this conspiracy to create a case against plaintiff and suppress and not pursue, during the course of this investigation potential criminal liability of other Democratic operatives including the moving defendants.

5. The newly discovered evidence of egregious prosecutorial misconduct throughout the proceedings of the investigation of this case leading to prosecution include:

    a) The Special Prosecutor Smith's forgery of signatures on purported witness affidavits introduced before the Grand Jury and/or disclosed as their prior sworn statements;

    b) The Special Prosecutor Smith's intention not to prosecute William McInerney, John Brown or Dan

2

     Brown, the three primary wrongdoers in the subject voter fraud, before being compelled in 2011 to do so because of the efforts of New York State Police Senior Investigator O'Brien and FBI Special Agent Alexander McDonald.

  c) New York State Police pursuit of William McInerney, Dan Brown and John Brown, and eventual commencement of charges against them, compelling Special Prosecutor Smith compelled to accept the charges and proceed with the prosecution of them.

  d) Failure/refusal of the prosecution to pursue fraud and/or forgery charges against the Special Prosecutor Smith for notarizing the forged signature (on an absentee ballot) of Joleen Van Vranken.

  e) Failure to offer any credible evidence that the signature on any forged absentee ballot application or votes was the plaintiff's.

The point here is that defendant Smith then proceeded with the investigation and prosecution of the plaintiff thereafter, through two trials, for the exact crimes he knew and defendants, McInerney and J. Brown, admitted, were committed by them and not by the plaintiff.

  6. The newly discovered evidence of the Special Prosecutor's forgeries of signatures include: 1) two sworn statements of Joleen Van Vranken; 2) a sworn statement of Edward Van Vranken; 3) an affidavit of Joleen Van Vranken; and, 4) the expert opinion of document examiner Robert Bayer that the signature of Joleen Van Vranken and purported affidavit notarized by the Special Prosecutor were not genuine; and, 5) the trial testimony of Joleen Van Vranken and Jermaine Joseph that the signatures on the purported affidavits notarized by the Special Prosecutor were not genuine, and not their's, and thus forged. These

documents are annexed hereto as **EXHIBIT 1**.

7. The newly discovered evidence of the Special Prosecutor's misconduct in pursuing a scapegoat prosecution of the plaintiff includes, *inter alia*, the unequivocal trial testimony of prosecution witnesses McInerney and John Brown before the Special Prosecutor informed them through their attorneys that they would not be prosecuted for the subject voter fraud. This evidence is in direct contradiction to the material fact in the affidavit in opposition to motions that were filed with the Court. This all obviously raises issues of fact as to the conspiracy and the roles of Special Prosecutor and defendants John Brown and Dan Brown in this conspiracy and subsequent cover up of their criminal liability in the course of pursing the criminal liability against plaintiff through the initial and subsequent investigation, leading to prosecution of him.

8. In the course of this prosecution, defendant McInerney, a major witness for the prosecution in the trial against plaintiff, admitted on one occasion that when a conversation about John Brown forging absentee ballot applications and absentee ballot was conducted, plaintiff was only an arm and a half length away. At another occasion, he conceded that he was at least twenty or thirty feet away and could not hear him. Clearly, his testimony is replete with proof of plaintiff's complete lack of involvement, which defendants jointly and severally knew about from their initial investigation through their subsequent prosecution and eventual trials. Excerpts of this convoluted testimony of defendant McInerney is annexed hereto as **EXHIBIT 2** which obviously at least raises issues of fact for trial.

9. At one point, McInerney even admitted on cross-examination during his trial testimony that he never said that plaintiff was nearby when Brown forged the absentee

4

ballots in front of McInerney while McInerney looked on. McInerney did admit that upon hearing that the State Police were prosecuting him above and beyond and without the participation or knowledge of the Special Prosecutor, defendant Smith, who previously determined not to prosecute him and Brown to cover up this conspiracy against the plaintiff, he went to McNally's house for advice in response to McNally's call to him. He conceded during his trial testimony that McNally discussed the matter with him and recommended that he go to Attorney James Long for representation before anyone else hired him. The bottom line is that despite defendant McNally's recusal, McNally discussed the case with McInerney and gave him advice as to it proving or at least raising issues of fact as to his involvement and participation of defendants McNally and McInerney in the conspiracy to scapegoat blame on the plaintiff without any proof against the plaintiff. See excerpts of this trial testimony of defendant McInerney which is annexed hereto as **EXHIBIT 2**.

10. William McInerney also gave a statement under oath, a copy of which is annexed hereto as **EXHIBIT 3**, that he saw Tony Renna hand ballots from Jackson Street to John Brown. Renna was following him, and saw John Brown fill out and vote the ballots, and he heard Tony say to John Brown, "Do you have to do that in front of everyone?" I asked John Brown, "What the hell are you doing?" I knew that the handwriting and the date for the ballot application for Jackson Street was John Brown's. I didn't actually see him complete the ballots. At some point, someone said, which I don't remember which one, "Are these going in, right?"

11. Subsequently, there was a meeting at LoPorto's Restaurant days later, which made William McInerney very nervous. He wanted to stay away from home to avoid liability. It was some time during this week that he decided to protect himself and according to

his statement, he called the DA Richard McNally, the defendant who had attempted to recuse himself due to conflict, but agree d to meet with him. He invited him to his house in Valley Falls, and he spoke on the porch, he discussed the case with him and told him what lawyer to retain, a former election law attorney, James Long, Esq.

12. Richard McNally also told McInerney to reach out to Edward McDonough and advise him to seek a second opinion on the advice he was receiving. Defendant Richard McNally clearly said, "I like Eddie" (referring to Edward McDonough) and "I don't think Brian Premo is doing him any favors in his representation." Richard McNally recommended him to Kevin Luibrand, or another attorney he doesn't remember.

13. Proof of the conspiracy exists in the testimony of defendant McInerney in the first trial against me. He testified that after his recusal, defendant McNally called him to discuss the case. (See excerpt of trial testimony of McInerney attached hereto as **EXHIBIT 4**). He also testified that Special Prosecutor Smith promised him that he would not be prosecuted (See excerpt of trial testimony of McInerney attached hereto as **EXHIBIT 5**). Furthermore, this promise was made despite the fact that McInerney admitted he committed hundreds of forgeries on ballots, even in 2007, when he did it for McNally's successful campaign. (See excerpt of trial testimony of McInerney attached hereto as **EXHIBIT 6**). The "coup de grace" is McInerney's trial testimony concession that if he was going down he was "taking everyone down" (See excerpt of trial testimony of McInerney attached hereto as **EXHIBIT 7**). This is the obvious cause of this conspiracy.

14. Additionally, I heard defendant John Brown say later on that McInerney told him the case was going to the Grand Jury and stop there. John told me that McInerney was

6

told this by McNally. Furthermore, even before any indictment by the Grand Jury, I was in the City Clerk's Office in Troy, New York with McInerney, John Brown, Dan Brown, Clem Campagna, Gary Gaulskui and Ken Zaluski. Someone said to me then, "They're going to indict you." I said, "What the fuck did I do?" They said, "Nothing." All the parties there knew I was being prosecuted without evidence to cover up the criminal liability of others, including those present.

15. Dan Brown wrote sick or not sick on his absentee ballot applications according to his testimony at trial. He admitted clearly writing notes on applications such as temporary illness which are not based at all upon facts and which he filled out in violation of the law and did not have the absentee person fill out on their own absentee applications and ballots. He had no idea, he admitted, whether the voters were ill or not. He gave these falsely filled out and wrongfully filled out ballot application and absentee ballots to his brother, John, who then forged and filed them. He was his brother John's campaign manager. He collected the applications that were forged and false from McInerney proving at least his possession of same for which he was never prosecuted although with less or no proof plaintiff was. Dan Brown took the applications from people and went with Tom Aldrige and Kevin McGrath. He actually filled out notes on them in violation of the law rather than having the actual absentee voters fill them out.

16. William McInerney indicated that when he signed and filled out the forged application, he gave them to Dan Brown who then turned them over to McDonough. According to William McInerney, he forged them all and gave them to John Brown and Dan Brown and that Dan Brown mailed them to the Board of Elections which is clear wire fraud in violations of

RICO laws and Title 18 §1950 of the U.S. Code. For some reason, that is not clear that neither Dan Brown nor John Brown got charged for these clear admissions and violations of law.

17. Dan Brown testified at trial against me in the first trial. He admitted that he gave forged absentee ballots of Yurelis, Gonzalez, Kimberly Yando, Mark Welch, Nadine Legase, and Terence Conway to his brother who filed them. Furthermore, he admitted that William McInerney asked him to mail certain absentee ballot applications. He admitted that what he received to mail did not match up when he got the envelopes, and that he was told by McInerney facts that lead him to question the validity of these absentee ballot applications. But Smith, the defendant who was the mastermind of the conspiracy, never even considered prosecuting him and never asked him at trial about his own particular involvement in the creation, possession and filing of absentee ballot applications. It is clear from this testimony that he was participating with Smith in perpetuating the false investigation to cover up the liability of Democratic operatives like his brother and himself as well as William McInerney so his criminal liability could be focused on the plaintiff.

18. William McInerney clearly testified that on Saturday, September 12, 2009, he met with John Brown, Dan Brown, Clem Campagna, Mike LoPorto, Tom Aldrige, Anthony DeFiglio, Kevin McGrath, and Robert Martiniano at Griswold Heights to get signatures. He also testified that John Brown came to his office at Troy City Hall and went over the applications and that later Edward McDonough called McInerney at his office and said he is going to bring the ballots to me at my office. McInerney stated in his statement, "I was pissed off. I asked him why the fuck are you bringing them to me? My name isn't on them." McDonough said that Brown had left them in his office and that he was going to deliver them to me. When McDonough

8

delivered the ballots to my office, they were in a manilla folder. There were 30 ballots in the envelope. McDonough went over the voting list.

19. There are plethora of witnesses who also heard that and communicated that to me. These witnesses include Anthony Rena, Kevin McGrath, Robert Martiniano, and Anthony DiFiglio. I heard them acknowledge that and we all talked about that. I was a party to those conversations. These facts are clearly issues of fact which require denial of the motion to dismiss. They clearly establish facts contrary to those alleged by the defendants which go directly to the issues of their possession of forged and false absentee ballots and absentee ballot applications of crimes were committed by them and not be me.

20. What's missing from the above is this unavoidable fact, or at least a fact that is completely contradicted by the conclusory facts set forth in their affidavits in support of the motion to dismiss. The defendants, Daniel Brown John Brown, William McInerney, Anthony Renna and Anthony DiFiglio, told me that they knew that I was not guilty. They also told me they knew I was being prosecuted to cover up a politically advantageous failure to prosecute others especially McInerney, for crimes they committed and that I did not commit and for which there was no evidence that I committed. This bespeaks directly to a conspiracy engineered and run by defendant Trey Smith but also by and with the knowledge and understanding and cooperation of defendants William McInerny, John Brown and Daniel Brown to avoid criminal liability themselves and to place the liability on myself and Edward McDonough as a scapegoat cover up criminal liability so that they could avoid liability. They admitted these facts to me, we discussed these facts and the very fact that I am alleging this under oath on personal knowledge based on these conversations and my knowledge of the facts as set

forth herein and as set forth in the complaint, create issues of fact requiring denial of these motions to dismiss.

21.     For all of these reasons, at the very least, the testimony under oath of McInerney raises issues of fact which prove the ill-advised, misconceived, malicious, willful and wrongful investigation and prosecution of the plaintiff and the conspiracy to cover the obviously liable parties by focusing their testimony against the plaintiff and Edward McDonough requiring denial of this motion to dismiss.

WHEREFORE, your deponent respectfully requests that the Court deny the defendant McNally's motion to dismiss in its entirety, and for such other and further relief as this Court may deem just and proper.

_____
Michael LoPorto

Sworn to before me this
20 day of October 2015

_____
Notary Public, State of New York

PAULA M. CAMPIONE
Notary Public, State of New York
Qualified in Schenectady County
#4989417
Commission Expires December 2, 20 17