# EXHIBIT 2

1    STATE OF NEW YORK

2    SUPREME COURT                    COUNTY OF RENSSELAER

3    - - - - - - - - - - - - - - - - - - - - - - - - - X

4    THE PEOPLE OF THE STATE OF NEW YORK

5    - against -              Indictment #SP11-1002

6    MICHAEL LO PORTO,

7              Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - X

9    *JURY TRIAL*

10                          County Courthouse
                            Congress and Second Streets
11                          Troy, New York 12180
                            July 12, 2012.

12

     B e f o r e:

13

14                     HONORABLE GEORGE J. PULVER, JR.,
                       Acting Supreme Court Justice.

15

16   A p p e a r a n c e s:

17                          **For the People:**
                            TREY SMITH, ESQ.
18                          Special District Attorney-Rensselaer County
                            105 Jordan Road
19                          Troy, New York.

20
                            **For Defendant:**
21                          CHERYL COLEMAN, ESQ.
                            90 State Street - Suite 1400
22                          Albany, New York

23
                            MICHAEL LO PORTO, Defendant, in person.
24

25

                          *Judy A. DelCogliano*
                       *Official Senior Court Reporter*

2

## INDEX TO WITNESSES

|                          | Direct | Cross | Redirect | Recross  |
|--------------------------|--------|-------|----------|----------|

For the People:

| WALTER J. HOWARD, JR. | 3  | 13  | 16       |          |
| ROBERT MARTINIANO     | 17 | 61  | 88, 92   | 92       |
| WILLIAM A. MC INERNEY | 93 | 156 | 215, 219 | 218, 222 |

1          MR. SMITH:  Nothing further.

2          THE COURT:  You may stand down with the thanks

3     and gratitude of the Court.  We are going to recess for

4     one hour, ladies and gentlemen.  We are going to come back

5     at one o'clock, and Court is now in recess.  Thank you.

6          (A luncheon recess was taken.)

7          COURT OFFICER:  Jury entering.

8          THE COURT:  Be seated, folks.  Mr. Smith, call

9     your next witness, please.

10          MR. SMITH:  William McInerney.

11   **WILLIAM MC INERNEY**, after first having been duly sworn by the

12   Clerk of the Court, was examined and testified as follows:

13          THE CLERK:  This sworn witness is William A.

14   McInerney, M-C-I-N-E-R-N-E-Y.

15          THE COURT:  Your witness.

16   **DIRECT EXAMINATION**

17   **BY MR. SMITH:**

18        Q.   Mr. McInerney, would you state your full name for the

19   jury, please?

20        A.   William Andrew McInerney.

21        Q.   How old are you, sir?

22        A.   Forty-eight.

23        Q.   Where do you live?

24        A.   21st Street.

25        Q.   City of Troy, County of Rensselaer, State of New

1          A.    He, at the time, he was a Working Families Party

2     member.

3          Q.    Mr. McInerney, did you have any conversation with Mr.

4     LoPorto, the Defendant LoPorto, regarding Mr. Aldrich before

5     you made this effort to get these applications?

6          A.    Mr. LoPorto said that Mr. Aldrich would help in the

7     effort to try to win the primary.

8          Q.    Did you personally enlist Mr. Aldrich's help?  Did

9     you speak to Mr. Aldrich?

10         A.    No.

11         Q.    Did you use Mr. Aldrich's name in any way in

12    association with these 13 applications, sir?

13         A.    Yes.  I had them be deliverable to him.

14         Q.    And so the record is clear, did you write Mr.

15    Aldrich's name in as the deliver-to person on the absentee

16    ballot applications for these 12 or 13?

17         A.    Yes.

18         Q.    Mr. McInerney, did you -- I'm going to go back in

19    time a little bit, and then we will return to 2009.  Did you

20    commit crimes, including the falsification and forgery of

21    absentee ballot applications, ballot envelopes and ballots in

22    the years 2007 and 2008 in connection with elections held in

23    the City of Troy?

24         A.    Yes.

25         Q.    What, if anything, was your motivation for the

1    commission of these crimes in 2007 and 2008?

2          A.   To help the Democrats win and to gain employment.

3          Q.   Again, when was it that you lost your job with the

4    State?

5          A.   October of 2007.

6          Q.   What role, if any, did the procurement of genuine

7    signatures from voters on absentee ballot applications play in

8    connection with the crimes that you committed in 2007 and 2008?

9          A.   Some were legitimate and some not legitimate.

10         Q.   If you had a genuine application - excuse me - a

11   genuine signature on an absentee ballot application, could you

12   make use of that signature with regards to an absentee ballot

13   envelope, illegal use?

14         A.   If you had the application, could you use it to make

15   a signature on a ballot?  Is that what you are asking?

16         Q.   Yes.  In other words, let's say you go to a voter

17   and --

18         A.   I guess you would have to make a copy of that

19   application.

20         Q.   Did you do that, sir?

21         A.   There were times I did it, yes.

22         Q.   With regards to the absentee ballot applications

23   solicited by you and signed by voters in the City of Troy in

24   the years 2007 and 2008, what entries, if any, would you make

25   with regards to the excuse as to why the voter could not vote

1      in person at the polls?

2           A.   I said they were on vacation.

3           Q.   Were you concerned that your falsification of excuses

4      on these absentee ballot applications in 2007 and 2008 would

5      come to the attention of law enforcement?

6           A.   No.

7           Q.   Why not?

8           A.   Didn't think I was going to get caught.

9           Q.   Did you forge any signatures on absentee ballot

10     applications for voters in connection with elections held in

11     the City of Troy in the years 2007 and 2008?

12          A.   Yes.

13          Q.   Did you file those absentee ballot applications with

14     the Rensselaer County Board of Elections?

15          A.   Yes, I did.

16          Q.   Did you vote absentee ballots without the

17     authorization of voters in connection with the elections in the

18     City of Troy in 2007 and 2008?

19          A.   Yes, I did.

20          Q.   Did you forge voter signatures onto absentee ballot

21     envelopes filed with the Rensselaer County Board of Elections

22     in 2007 and 2008?

23          A.   Yes.

24          Q.   Sir, do you have any idea about how many times you

25     did that?

1          A.   No.

2          Q.   During the course of these crimes that you committed

3     in 2007 and 2008, did you have occasion to visit the Rensselaer

4     County Board of Elections?

5          A.   Yes.

6          Q.   Did you have a preference as to whom you dealt with

7     at the Rensselaer County Board of Elections in 2007 and 2008?

8                    MS. COLEMAN:   Objection, relevance to this

9          proceeding.

10                   THE COURT:   Overruled.   You may answer.

11         A.   I dealt with Commissioner McDonough and Mary Sweeney.

12         Q.   Why did you prefer to deal with Edward McDonough?

13         A.   Trusted him.

14         Q.   What were your dealings with Mary Sweeney and Edward

15    McDonough in connection with absentee ballot applications,

16    envelopes and ballots in 2007 and 2008?

17         A.   I trusted both of them.

18         Q.   Do you think that they knew what you were up to, sir?

19                   MS. COLEMAN:   Objection.

20                   THE COURT:   Sustained.

21         Q.   Do you have any reason to believe that they were

22    aware that you were committing crimes in 2007 and 2008, Mr.

23    McDonough and Ms. Sweeney?

24         A.   I didn't tell Mr. McDonough or Ms. Sweeney what I was

25    doing.

1          Q.   Other than these dealings with Mary Sweeney and

2    Edward McDonough, did anyone else assist you in your activities

3    with respect to absentee ballot applications, envelopes and

4    ballots in 2007 and 2008?

5          A.   No.

6          Q.   Directing your attention to August 26, 2011, did you

7    have occasion to appear before this Court to enter a plea to a

8    Superior Court Information charging you with forgery in the

9    second degree with respect to an absentee ballot envelope in

10   the name of Dametrias Banks?

11         A.   Yes.

12         Q.   What was your plea?

13         A.   Guilty.

14         Q.   Mr. McInerney, I show you what's been previously

15   marked for identification purposes as People's Exhibit 132.  Do

16   you recognize that document, sir?

17         A.   Yes, I do.

18         Q.   What is the document?

19         A.   It's a Cooperation Agreement.

20         Q.   Does your signature appear on the Cooperation

21   Agreement?

22         A.   Yes, it does.

23         Q.   That of your attorney?

24         A.   Yes, it does.

25         Q.   My signature, as well?

```
1        A.   Yes, it does.

2        Q.   And I signed that in your presence, sir?

3        A.   Correct.

4        Q.   And you signed it in mine?

5        A.   Correct.

6        Q.   With your attorney there?

7        A.   Correct.

8             MR. SMITH:  Your Honor, I would offer the

9    agreement.

10            MS. COLEMAN:  May I just see it?

11            THE COURT:  Do you want to examine it?

12            MS. COLEMAN:  Yes.  Your Honor, I object to this

13   going in as bolstering.  I mean, he can certainly ask him

14   about what the plea agreement is, but I think there's

15   things in here that are self-serving and bolstering.

16            THE COURT:  I will admit it subject to your

17   application for redaction of it.

18            MS. COLEMAN:  Thank you.

19       Q.   Mr. McInerney, what is your understanding of the

20   basic terms of the plea agreement, the Cooperation Agreement?

21       A.   I had to come and tell the truth.

22            MS. COLEMAN:  Objection, self-serving.

23            THE COURT:  Overruled.  Go ahead.

24       Q.   Mr. McInerney, in exchange, as part of the plea

25   agreement, what was your understanding as to any recommendation
```

1    that would be made by my office, which is the Special District

2    Attorney?

3          A.   That you would provide a sentencing recommendation.

4          Q.   Of what?

5          A.   Ninety days in the Sheriff's Work Program.

6          Q.   What is your understanding as to what that entails?

7          A.   I don't know; go out and pick up garbage on the

8    roads, whatever things they do.  But at the same time, my

9    attorney told me that it would be Judge Pulver who would

10   actually sentence me.

11         Q.   So, in other words, I would make a recommendation.

12   The Judge would be free to sentence you to something less or

13   something more?

14         A.   Correct.

15         Q.   And what is your understanding as to the most that

16   you could be sentenced to?

17         A.   Two and a third to seven.

18         Q.   Years?

19         A.   In prison.

20         Q.   All right.  Now, let's go back to September of 2009.

21   You've got the 13 -- 12 or 13, as you said, absentee ballot

22   applications that you and Mr. DeFiglio gathered; correct?

23         A.   Correct.

24         Q.   All right.  Did you cause the applications which the

25   two of you had gathered to be filed with the Board of

1      Elections?

2              A.   Yes.

3              Q.   How so?

4              A.   I don't remember how they got to the Board of

5      Elections.

6              Q.   Did you obtain blank absentee ballot envelopes and

7      ballots generated from the applications filed with the Board of

8      Elections?

9              A.   Yes.

10             Q.   How so?

11             A.   I'm not sure how I received them.  I know I received

12     them.

13             Q.   What did you do with those blank absentee ballots and

14     ballot envelopes?

15             A.   Made the attempt to go to the voters.  When they

16     didn't sign, sign for them.

17             Q.   Do you know how many of those envelopes you forged,

18     sir?

19             A.   I believe it was 13.

20             Q.   All of them; correct?

21             A.   (Witness nods.)

22             Q.   Now, before you went out to get the 13, did you have

23     any conversation with anybody as to how many votes you would

24     need?

25             A.   Yes.

Judy A. DelCogliano
Official Senior Court Reporter

1      Q.   To capture the Working Families Party?

2      A.   Yes.  Mr. McDonough told me that 125 should suffice.

3      Q.   Would that be total vote by --

4      A.   Total votes.

5      Q.   People going to the polls and absentee?

6      A.   Correct.

7      Q.   Directing your attention now to the weekend of

8    Saturday, September 12, 2009, did you make any effort to assist

9    John Brown, Clement Campana and the Defendant LoPorto to

10   capture the Working Families Party line?

11     A.   Yes.

12     Q.   Did you have any discussion with any of these

13   at-large candidates for the Troy City Council regarding this

14   Saturday, September 12, 2009, effort?

15     A.   If I didn't speak to them, then I spoke to one of

16   their supporters and asked them to go to Griswold Heights.

17     Q.   And why were you summoning this gathering at Griswold

18   Heights?

19     A.   They weren't anywhere near the number that they

20   needed to get to.

21     Q.   When you say the number, are you referring to the

22   absentee number that you had discussed with Mr. McDonough?

23     A.   I'm referring to the number, the total votes, the

24   125.

25     Q.   Did you have any understanding as to how many votes

_Judy A. DelCogliano_
_Official Senior Court Reporter_

1    the Democratic candidates had received in the preceding primary

2    of 2007 for the Working Families Party line?

3              MS. COLEMAN:  Objection, relevance, because he

4         didn't run in 2007.

5              THE COURT:  Overruled.  You may answer.

6    A.   No.  I wasn't sure what they received in 2007.

7    Q.   All right.  Do you remember about what time it was

8    that you arrived at Griswold Heights?

9    A.   Around ten o'clock, I believe.

10   Q.   And did you bring anything with you, sir?

11   A.   Clipboards, pens, application forms.

12   Q.   When you say application forms, are you referring to

13   absentee ballot applications?

14   A.   Yes.

15   Q.   Where did you get the absentee ballot applications?

16   A.   From the Board of Elections.

17   Q.   Were they blank?

18   A.   Yes.

19   Q.   Who was present at Griswold Heights around the time

20   that you arrived there, sir?

21   A.   Me, Dan Brown, Robert Martiniano, Thomas Aldrich,

22   Clement Campana, Anthony DeFiglio, Gary Galuski, Michael

23   LoPorto.  Did I say Kevin McGrath?

24   Q.   You did not.

25   A.   He was also there.

1       Q.   Did you have any role in directing the effort that

2   morning, sir?

3       A.   Yes, I did.

4       Q.   Would you tell the jury what your role was?

5       A.   I stated that, you know, people should go to Eddy's

6   Lane.  Kevin McGrath asked that he go up to his district to

7   garner applications.  I sent Thomas Aldrich and Dan Brown up to

8   Kevin McGrath's area.  Mr. LoPorto, Mr. Campana, they were

9   directed to go to Eddy's Lane with Mr. Martiniano, and Mr. John

10  Brown was supposed to meet them.

11      Q.   What did you do that day?

12      A.   I went around Griswold Heights.

13      Q.   With whom?

14      A.   Mr. Galuski and Mr. DeFiglio.

15      Q.   What did you do on that day with those two gentlemen?

16      A.   Solicited applications.

17      Q.   How did you solicit applications?

18      A.   Knocked on doors.

19      Q.   And could you be a little bit more specific as to

20  what would happen when the person who was registered in the

21  Working Families Party would come to the door, if they did?

22      A.   We asked them to fill out the application.  You know,

23  we told them they could vote absentee, instead of going to the

24  polls.

25      Q.   Again, sir, did you ask any of these voters if they

1    had one of the seven valid reasons why they could not go to the

2    polls on that day?

3          A.   No, I did not.

4          Q.   And why not?

5          A.   There weren't going to be any legitimate excuses.

6          Q.   Did you make any entries in the excuse fields of the

7    applications that you gathered that day with Mr. DeFiglio and

8    Mr. Galuski?

9          A.   No.

10         Q.   Did you make any entries in the deliver-to fields of

11   the applications that you gathered that day with Mr. DeFiglio

12   and Mr. Galuski?

13         A.   No.

14         Q.   Sir, in your mind, did Mr. DeFiglio appear to know

15   what the plan or the scheme was with regards to not asking

16   about the excuse when you went to the homes of these voters?

17              MS. COLEMAN:   Objection; facts not in evidence.

18              THE COURT:   Overruled.

19         A.   Did he know what we were doing?  Is that what you are

20   asking me?

21              THE COURT:   If you know.

22         A.   Yes.

23         Q.   How about Mr. Galuski?

24         A.   He was there.  I mean --

25         Q.   Did Mr. Galuski speak with any of the voters in your

*Judy A. DelCogliano*
*Official Senior Court Reporter*

```
 1    presence?

 2         A.    He spoke to Michele Zillgitt when we were down in

 3    South Troy, but they spoke about -- I believe it was his

 4    stepson and her niece were dating at one time, and she was

 5    hoping that they could get back together.

 6         Q.    Did Mr. Galuski ask any voter in your presence

 7    whether or not they had an excuse that would prevent them from

 8    going to the polls, a legitimate excuse, for September 15,

 9    2009?

10         A.    Not that I remember, no.

11         Q.    Can you tell us, sir, about what time it was that you

12    were done gathering applications that day?

13         A.    Mr. Galuski gave me a ride up to Northway Toyota

14    because my car was being serviced.  We probably stopped 3:30,

15    quarter of four, something like that.

16         Q.    Did you have occasion to have a phone conversation

17    with a Robert Martiniano around that time frame, getting on to

18    four o'clock?

19         A.    He called me.

20         Q.    And what did he say to you and what did you say to

21    him?

22         A.    He told me John Brown was going to forge, Xerox,

23    trace signatures.

24         Q.    And what was your reply, if any?

25         A.    I told him I wasn't with John Brown.  I didn't care
```

1    what he was doing.

2        Q.    What else did you say, if anything?

3        A.    I said, "Eventually, I'm sure that all the

4    applications will end up in my lap."

5        Q.    All right, sir.  At the end of the day, Saturday,

6    September 12, 2009, with regards to the applications that you

7    had gathered with Mr. Galuski and Mr. DeFiglio, who took

8    possession of the applications?

9        A.    I did.

10       Q.    What did you do with them from Saturday,

11   September 12th, up to the morning of Monday, September 14th?

12   In other words, did you make any additions, deletions,

13   erasures, anything of that sort?

14       A.    No.

15       Q.    I'm going to direct your attention to the morning of

16   September 14, 2009.  Did you work that day?

17       A.    Yes, I did.

18       Q.    And where was the Troy City Clerk's office located

19   back in September of 2009?

20       A.    One Monument Square.

21       Q.    And that's just a few blocks from this courthouse;

22   correct?

23       A.    Correct.

24       Q.    Sort of close to the Hudson River, the building was?

25       A.    Correct.

1      stand, though, until we return to court.  Court is in

2      recess.

3                  (Brief recess taken.)

4  (Voluntary Statements marked Defendant's Exhibits F-1 and F-2

5  for identification.)

6                  THE COURT:  Be seated, please.  Defendant's

7      cross-examination.

8  **CROSS-EXAMINATION**

9  **BY MS. COLEMAN:**

10      Q.  Mr. McInerney, there came a point in time in this

11  investigation, early on, when you learned that Michael LoPorto

12  was charged with forging the ballots and applications that are

13  in Exhibit 13A and a number of other exhibits that you have;

14  right?

15      A.  Correct.

16      Q.  All right.  Now, at this point in time in the

17  investigation, you had not been charged; right?

18      A.  Correct.

19      Q.  And Michael LoPorto was charged with those forgeries;

20  right?

21      A.  Correct.

22      Q.  And you knew that; right?

23      A.  Yes.

24      Q.  And you knew that he didn't do those forgeries;

25  right?

```
 1              A.   Correct.

 2              Q.   'Cause you knew that you did those forgeries; right,

 3       Mr. McInerney?

 4              A.   Correct.

 5              Q.   And you never said anything to the State Police about

 6       that; right?

 7              A.   No, I did not.

 8              Q.   You never said anything to Mr. Smith about that;

 9       right?

10                   MR. SMITH:  Objection.  Can we have a

11              specification as to the point in time?  Is she saying

12              never at the time that Mr. LoPorto was charged or never,

13              ever, ever?

14                   THE COURT:  Could you specify the time?  I

15              thought it was at or about the time that your client was

16              charged, but you can give a date.

17              Q.   I got it.  Thank you.  All right.  Never, ever, ever,

18       Mr. McInerney, until it was learned through other means that he

19       didn't do the forgeries; right?

20              A.   Correct.

21              Q.   Didn't come from you; right, Mr. McInerney?

22              A.   I'm sorry?

23              Q.   It didn't come from you, that information that he

24       didn't do the forgeries; right?

25              A.   Did it come from me that he didn't do the forgeries?
```

1          Q.   That he did not do that?

2          A.   Eventually.

3          Q.   But you didn't admit to them, until it was already

4     learned by other sources, by law enforcement, that he didn't do

5     them; right?

6          A.   I'm not sure I follow your question, ma'am.

7          Q.   It wasn't you who went to either Mr. Smith or the

8     State Police and said, "Hey, you know, you are prosecuting an

9     innocent guy for those forgeries," right?

10         A.   No.

11         Q.   And really, Mr. McInerney, since you say your

12    Cooperation Agreement requires you to tell the truth,

13    truthfully, really, you were never gonna, but you had --

14              THE COURT:  I'm sorry, counsel.  The acoustics

15         are such, if you keep turning your back, I don't hear it

16         and the Stenographer doesn't hear it.

17         Q.   Fair enough.  And you never would have, unless that

18    information was revealed elsewhere; right?

19         A.   Unless I was charged with them, correct.

20         Q.   You were never gonna; you were willing to let Mr.

21    LoPorto be prosecuted for forgeries he didn't commit, as long

22    as it benefited you; right, Mr. McInerney?

23         A.   I reserved my right to remain silent.

24              MS. COLEMAN:  Then I'm going to move to strike

25         his whole direct testimony.

1      A.   I was not in the courtroom when certain people

2   testified.

3      Q.   Well, you are aware, for example, sir, that you are

4   not the only witness who has testified under Cooperation

5   Agreement; right?

6      A.   Correct.

7      Q.   You are aware, for example, that Mr. John Brown also

8   is testifying and has, in fact, testified under a Cooperation

9   Agreement, correct, in previous proceedings?

10     A.   Correct.

11     Q.   And you are aware that your testimony and his

12  testimony on -- for example, the period of time on Monday,

13  September 14th, after there's an attempt to get signatures,

14  your version and his version vary significantly; correct?  Are

15  you aware of that?

16     A.   I am aware of that.

17     Q.   And both of those cannot be simultaneously the truth;

18  right?

19     A.   He has a different version of what my version is.

20     Q.   For example, you are aware of the conversations with

21  the prosecution; that Mr. Brown says that Mr. LoPorto wasn't

22  anywhere near when Brown forged the ballots out in the open;

23  right?

24     A.   I don't know if he said that or if he didn't say

25  that.

```
 1              Q.   You don't know that?

 2              A.   I wasn't in the courtroom when Mr. Brown testified.

 3              Q.   Right.  But you have discussed that, to be fair, with

 4         the prosecution and in your -- and the State Police in your

 5         interviews prior to your testimony?

 6              A.   They said that John Brown said this?

 7              Q.   And you know that it's different?

 8              A.   Yes.

 9              Q.   Than yours?

10              A.   Yes.

11              Q.   And you are aware that Mr. Brown says that Mr.

12         LoPorto was off talking to a voter when Brown was doing his

13         forgeries; right?

14              A.   That's what Mr. Brown says?

15              Q.   Right.  And you are aware that there are differences

16         in your testimony on that topic; correct?

17              A.   Correct.

18              Q.   As there are in regards to the topic of whether or

19         not you said, whether you ever said, "I'm not bringing these to

20         the Board of Elections," and whether Mr. LoPorto then said,

21         "I'll do it," right?  You know there's a difference in that

22         aspect; right?

23              A.   In my aspect and Mr. Brown's aspect?

24              Q.   Exactly.

25              A.   Yes.
```

1  presented yourself, if you will, not only to the Democrat City

2  Council candidates who won to ask about being appointed City

3  Clerk - right?

4      A.   Correct.

5      Q.   - you also presented yourself to the Democratic

6  County Chairman, Tom Wade, at that time; right?

7      A.   Correct.

8      Q.   Your goal, sir, at that time, to be fair, basically

9  what you indicated was that you believed that you deserved to

10 be rewarded with good employment for your hard work; right?

11     A.   I asked for a job.

12     Q.   Right.  I mean -- but I mean, to be fair, I mean the

13 job, you didn't want to pick up garbage; did you?

14     A.   Would have.

15     Q.   Well, that's not -- as luck would have it, sir,

16 that's not the job you got; right?

17     A.   Correct.

18     Q.   The job that you got was the City Clerk; right?

19     A.   That's correct.

20     Q.   And that paid how much a year, sir?

21     A.   54,000.

22     Q.   And in 2008, you also committed forgeries in that

23 election; correct?

24     A.   Yes.

25     Q.   2008.  Was that the year Obama ran?

```
 1              A.   I believe it was.

 2              Q.   And of course, you weren't a giant fan of Obama;

 3         right?

 4              A.   I supported him.

 5              Q.   All right.  Well, you did the forgeries that you did

 6         in 2008 to help yourself; right?

 7              A.   Correct.

 8              Q.   And since the City Council wasn't up -- was the City

 9         Council up?

10              A.   They didn't run until the following year.

11              Q.   They weren't; correct?

12              A.   Correct.

13              Q.   And you are City Clerk; correct?

14              A.   Correct.

15              Q.   So, your job, fair to say, that year now, wasn't

16         directly on the line as a result of the '08 election; right?

17              A.   Correct.

18              Q.   But you committed the forgeries, anyway; correct,

19         sir?

20              A.   Yes.

21              Q.   And that was because you wanted to continue to

22         produce; right?

23              A.   Yes.

24              Q.   Because you figured that all this time, you're

25         garnering favor with anybody that you could in the party;
```

```
 1    right?

 2         A.    Garnering favor?

 3         Q.    Sure.  Would you like me to -- well, you wanted to

 4    show them what a good job you did; right?

 5         A.    Correct.

 6         Q.    So that you could, at a minimum, keep your job;

 7    right?

 8         A.    It was up to the City Council whether I kept my job.

 9         Q.    Well, you knew that -- well, sir, you approached the

10    County Democratic Chairman, as well, in 2007; correct?

11         A.    Yes.

12         Q.    Although he didn't have the technical power to make

13    you City Clerk; right?

14         A.    No, he did not.

15         Q.    Let's be real.  I mean, you were trying to get the

16    favor of as many powers to be as you could of the party; right?

17         A.    I guess you are saying was I doing it for everybody?

18    Is that what you are asking me?

19         Q.    No, sir.  What I'm saying is you wanted to get, I

20    guess, noticed, maybe, by the people in the party as someone

21    who does hard work and should get rewarded; right?

22         A.    I did it as a hard worker and I was trying to help

23    Democrats win.

24         Q.    But mostly yourself; right, sir?

25         A.    It wasn't to benefit me.  If the candidates won, it
```

1    lawyer, you did make both deletions and additions to that

2    statement; right?

3          A.   Yes.

4          Q.   And nowhere, sir, in that statement do you ever,

5    ever, ever say Mike LoPorto or Clement Campana was right there

6    when Mr. Brown forged those ballots in front of you and you

7    looked on; right?

8          A.   No, not in the statement.

9          Q.   Never, either statement; right?

10         A.   Correct.

11         Q.   Never once; right?

12         A.   Correct.

13         Q.   Now, sir, I think you said that you didn't have any

14   use for the Working Families Party yourself; right?

15         A.   Correct.

16         Q.   You didn't like or trust those people; right?

17         A.   Correct.

18         Q.   When you said before that you didn't like or trust

19   those people, what did you mean by that?

20         A.   I meant that they had a candidate that interviewed

21   for the Council District 3 seat who said, if he didn't get the

22   nod, he wouldn't run in the primary or take the Working

23   Families line.

24         Q.   But that wasn't all?

25         A.   He reneged on his promise.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

```
 1            Q.   But that wasn't the only reason; right?  Because you

 2       said you didn't like "them" and you didn't trust "them".

 3       Right, sir?

 4            A.   Correct.

 5            Q.   Who did you mean by "them"?

 6            A.   Brant Caird, Jim Welch, Russ Dzembo.

 7            Q.   On the other hand, you knew Mike LoPorto, he liked

 8       and got along with and had a great relationship with the

 9       Working Families Party; right?

10            A.   Yes, he did.

11            Q.   By the way, John Brown, not so much; right?

12            A.   Correct.

13            Q.   And you, not so much; right?

14            A.   Correct.  I didn't have dealings with them.

15            Q.   You didn't really like the idea at all about,

16       particularly, even going out and trying to deal with those

17       people; right?

18            A.   No.

19            Q.   And it's your testimony that you said that to Mr.

20       Brown; right?

21            A.   Correct.

22            Q.   And your testimony, to be clear on this point, is

23       that John Brown comes to you first and says he wants to win the

24       Working Parties Family line and that you actually say to him,

25       "What ya gotta do that for?  You won with one line last time.
```