# EXHIBIT 1

GEAL-19 REV (04/06) VOLUNTARY STATEMENT

# NEW YORK STATE POLICE

## VOLUNTARY STATEMENT


DEFENDANT'S
EXHIBIT E(2)
PENGAD 800-631-6989
7/12/13  4d

COUNTY OF    RENSSELAER

TOWN OF    BRUNSWICK

STATEMENT START TIME:   8:40   ☒ AM ☐ PM

DATED:     SEPTEMBER 16, 2011

I, William A. McInerney, AGE: 47 AND BORN ON: ▆▆▆▆, AND RESIDING AT: 2423 21ST ST. APT. #5 TROY, NY, HAVE BEEN ADVISED BY: Inv. John J. Ogden Jr., OF THE NEW YORK STATE POLICE, OF THE FOLLOWING:

    I HAVE THE RIGHT TO REMAIN SILENT AND I DO NOT HAVE TO MAKE ANY STATEMENT IF I DO NOT WANT TO.

    IF I GIVE UP THAT RIGHT, ANYTHING I DO SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW.

    I HAVE THE RIGHT TO HAVE A LAWYER PRESENT BEFORE MAKING ANY STATEMENT OR AT ANY TIME DURING THIS STATEMENT.

    IF I SHOULD DECIDE THAT I DO WANT A LAWYER AND CANNOT AFFORD TO HIRE ONE, A LAWYER WILL BE APPOINTED FOR ME FREE OF CHARGE AND I MAY HAVE THAT LAWYER PRESENT BEFORE MAKING ANY STATEMENT.

    I ALSO UNDERSTAND THAT I HAVE THE RIGHT TO STOP AT ANY TIME DURING THIS STATEMENT AND REMAIN SILENT AND HAVE A LAWYER PRESENT.

I FULLY UNDERSTAND THESE RIGHTS AND AT THIS TIME, I AGREE TO GIVE UP MY RIGHTS AND MAKE THE FOLLOWING STATEMENT;

_____
WITNESS

_____
WILLIAM A. MCINERNEY

    I am at the State Police Station in Brunswick, NY. I am here with Gregg Amiroso. Mr. Amiroso is an attorney and associate of my Attorney James Long. Mr. Long has asked Mr. Amiroso to accompany me to this interview, and I acknowledge that he is my legal counsel for the purpose of this interview. I know that Inv.'s Ogden and Fancher have been assigned to investigate the Absentee Voter Ballot Fraud which took place in September of 2009 and affected the Primary election in the City of Troy for the Working Families Party. I am here to provide any and all information I have pertaining to my conduct and information I possess as to the conduct of other persons who were involved in the procurement and subsequent forgery of Absentee Ballot Applications and the Ballots generated from those ballot applications.

    I began my career in politics in the mid nineteen eighties. I received a patronage job in the State

PAGE 1 OF 6 PAGES

Legislature. Edward McDonough Sr. was my Benefactor in receiving this position. My first job was in the Bill Drafting Dept. I moved to the Assembly in various departments. I worked there until 2007. When I received the position I knew my job was contingent upon my service to the Democratic Party. I had been a volunteer for some time prior to Mr. McDonough helping me to get the job. In 1996 or 1997 I became a committeeman in the City of Troy. In my capacity as a committeeman my responsibilities to the Democratic Party increased. I was now responsible for obtaining signatures on Petitions and for any other tasks required to promote a candidate. I posted Political signs, did mailings, organized fund raisers, and any other function to assist the Party and our candidate's campaigns.

I lost my job in the Legislature in 2007. I needed another job. I thought that if I worked hard and made a significant contribution to the party during the 2007 election cycle I may be able to put myself in a position to ask for a new job in the Democratic Party. I knew from my previous experiences in politics that there were several ways that an election could be influenced. . The residents of the City's Low income public housing were also targeted in the party registration process. If a voter was registered in a Political Party, their vote was available to forge in future primary and general elections. I also learned that Absentee Ballots were a way to influence the outcome of an election. By targeting voters who didn't regularly vote, or who had moved away, or were just ignorant to the absentee voting process, an absentee ballot could be cast in their name and it would not be discovered because no one would ask any questions as to the authenticity of the ballot. There were several methods employed to complete this type of manipulation. An actual signature could be procured from the voter with the promise that the vote itself would be taken care of. Another method would be to solicit the absentee Ballot Application, and if the voter wasn't home, or didn't answer the door, then the name would just be forged. Once I had a list of voters registered in the Democratic Party, I could go out in my district and solicit absentee Ballot Applications in order to generate an actual Absentee Ballot. Once I had the Absentee Ballot I could vote the Party Line on every one and have an influence on the outcome of a given election. When ever I would go to the Board of Elections to obtain Absentee Ballot applications or to turn in Absentee Ballots I would deal specifically with Ed McDonough Jr. The Democratic Commissioner, or Mary Sweeney his Senior Clerk. I dealt with Ed and Mary for the specific reason that I knew that they would never ask me a question about it. I would ask for many absentee Ballot applications at a time just prior to the election. I wouldn't turn in the absentee Ballots until the day of the election. This is a strategy on both sides of the ai sle to prevent the other party from knowing how many absentee ballots are being cast. Whenever I obtained a legitimate ballot, I mailed it in. From my experience, my success rate in procuring Absentee Ballots was far and away above the average of other workers. During the 2007 and 2008 election cycles my success at procuring absentee ballots became common knowledge. Everyone knew that for just about every absentee ballot application that I received, a completed absentee ballot would be received at the board of Elections. I never actually told anyone what I was doing, and no body ever asked me how I was so successful.

In January of 2008 I was rewarded for all of my "hard work." I was appointed to the position of Troy City Clerk by the Troy City Council. The Democratic Party took control of the City council. Clement Campana was elected as the president of the City Council. Clem nominated me for the position. My efforts at obtaining absentee ballots continued during the 2008 election cycle. I forged absentee ballot applications and I also forged the ballots corresponding to many of those applications. During the 2007 and 2008 election cycles I acted alone in forging ballots and applications. I am convinced that people knew what I was doing, but I did act alone.

In the summer of 2009 several of the City Council candidates expressed concern that the Mayor of Troy, Harry Tutunjian, would cause a large Republican turn out and that some of the lesser known candidates in the Republican party would "ride his coat tails" because he had won by a landslide over the Democratic candidate, Jim Conroy, in the 2007 election. After the first week in July, when Petitions were submitted, there were rumblings within the Democratic Party that we needed to control the Working Families Party Line in order for our candidates to keep their seats on the City council. During the third week of August 2009 following a City council committee meeting I was approached by John Brown. John Brown is a City councilman and it is well known that he is very ambitious and wants to be Mayor after Tutunjian's term is over. Brown came up to me following the meeting, outside of the City Hall. I was on my way to my car. Brown told me that he wanted the working Families line. Brown

knew that whomever was the City Council President had the inside line at receiving the Party's endorsement to run for Mayor in the next election, which would be an open seat after Tutunjian's term expired. John Brown, Clement Campana and Michael LoPorto are the Democratic "At large" Candidates on the City council. All three were in agreement that they needed the WFP Line, but all three also wanted to receive the most votes in the "at large" race for City Council. So they were allies and competitors at the same time. All three had Party interests and personal interests working against each other. When I left the City council committee meeting I went to Michael LoPorto's restaurant on 4th St. in Troy. Present at the restaurant were: Michael LoPorto, Clement Campana, Robert Martiniano, Thomas Aldrich, Anthony DeFiglio, Kevin McGrath and me. During the meeting the control of the WFP line was discussed. Michael LoPorto and Clement Campana both spoke to me personally and told me there wishes to control the WFP line. It was clear to me that Brown, Campana and LoPorto all were speaking to me personally because they were aware of my record at procuring absentee Ballots. Kevin McGrath also commented that he would like to control the WFP in his Council District. He stated that he thought there were about thirty WFP votes in his District. Anthony DeFiglio had a list of the registered voters in the WFP. He noted that most of the voters were residents of the City of Troy Public Housing. Anthony advised that procuring those votes wouldn't be a problem. Anthony was a clerk at the City's housing authority, and most of the voters know him and will open their doors for him. I argued against this strategy because I knew that I really didn't know most of the officers in the WFP and I didn't trust them. I also knew that, even though Harry Tutunjian had won the Mayor's race in 2007, the Democratic candidates had won the City council. I knew that there must have been some previous discussion about winning the WFP line. That was the only explanation for Anthony DeFiglio to have the WFP voter registration list. I didn't want to be involved in the whole idea but I knew that LoPorto, Campana and Brown didn't trust each other and they obviously all were looking to me to insure the outcome. Michael LoPorto said to me something to the effect of "Lets get the working families Party line, Lets get it done". I knew that I would be taking a chance helping these guys. I was hoping that LoPorto, Campana and Brown would take care of the ballots, but I knew it was going to be a problem. There were several reasons for my concerns. First was that Brown, LoPorto and Campana didn't trust each other. Secondly, I didn't know or trust any of the WFP people. And third, there were just too many people involved and I knew something would go wrong, but I didn't see myself as having a choice. My job was dependant on those three controlling the WFP line. I was in a no win. If they won and didn't control the line then they would know that I didn't do what was asked and I believed I would probably lose my job, and if they lost, I was out anyway. There was some discussion about the absentee ballot applications and who they would be released to. Michael LoPorto said that Thomas Aldrich would help us. When I obtained a Ballot application I often put "Thomas Aldrich" as the name in the "release to" section of the application.

I made contact with Ed McDonough Jr. I asked him how many votes it would take to insure that our candidates controlled the WFP line. McDonough told me that it would take 125 votes, total in person and absentee, to control the line. During the meeting at LoPorto's, The candidates had a discussion and someone said that we needed 25 votes in each of the six voter districts. I said that there was no possible way that we were going to get that many votes. It was abundantly clear to me what was expected of me from the three candidates, Brown, Campana and LoPorto. They all knew what my record was for obtaining absentee ballots. I can not stress enough how much they distrusted each other and looked to me to ensure that for every ballot application there was a ballot voted for them.

During the next few weeks I solicited absentee ballot applications in the Public Housing in the City of Troy. I did this with Anthony DeFiglio. Anthony would usually knock on the door and the tenants would answer for him and then I would obtain their signature on the ballot applications. We received approximately thirteen applications between the date of the meeting at LoPorto's and Friday, September 11th, 2009. I can't remember who actually delivered those applications to the Board of Elections. I do remember that I forged those ballots and gave them to Dan Brown along with a couple of others that I had forged for the Democratic Primary. I believe that there may have been sixteen in all. Thirteen from the WFP and three from the Democratic primary. They were all wrapped in a rubber band. I remember when I handed the Ballots to Dan Brown I told him " you should mail these, you shouldn't hand them all in at once". I can't say for sure why Dan Brown was the person I gave those

ballots to.

On Friday September 11th, 2009 I had telephone conversations with the candidates. We discussed that only about a dozen or so absentee ballots had been completed. It wasn't enough and we all agreed to meet at Griswold Heights on Saturday , September 12th, 2009 to solicit more applications. On Saturday, September 12th, 2009 I met with: John Brown, Dan Brown, Clem Campana, Michael LoPorto, Thomas Aldrich, Gary Galuski, Anthony Defiglio, Kevin McGrath, and Robert Martiniano at Griswold Heights. We separated into groups and began to solicit voters for absentee ballot applications. Kevin Mcgrath told me to send someone up to his district "who know what's going on" . As far as I know Dan Brown and Tom Aldrich went to the North end of Troy to solicit. John Brown, Campana, LoPorto, and Martiniano went to North Central. They all stayed together because they didn't trust each other and were keeping an eye on each other. I stayed in Griswold Heights with Anthony DeFiglio and Gary Galuski. At about 4:00 or 5:00pm I had completed soliciting applications. I was at Northway Toyota in Latham, Gary Galuski had given me a ride up there to pick up my car. I received a telephone call from Robert Martiniano. Martiniano told me that John Brown was going to forge signatures. I told Martiniano that "I don't know what John Brown is doing, you're with him." At some time I received a phone call from Kevin McGrath. Kevin wanted to know how many applications we solicited from his voter district. I told Kevin that I didn't have any idea how many we got from his district.

On Monday , September 14th, 2009 John Brown came to my office at Troy City Hall. We continued going over the applications and the numbers we needed. We compared the names on the registration list to the names on the applications we had solicited. I checked them off and we got a count. We made photocopies of all of the applications and I kept the copies. There is only one reason for us to make photocopies of the applications. Once a ballot is generated we need the copy of the application just in case we are not able to locate the voter to sign the ballot envelope. Should we not be able to locate a specific voter we can then use the application to either trace or copy their signature on the ballot envelope. John was at my office for about twenty minutes or so. John took all of the original applications over to the Board of Elections. I wasn't at the BOE, but it is my understanding that John left the applications with Ed McDonough. Ed called me later in the morning, at around 10:30 or 11:00 and told me that he was going to be bringing the ballots to me at my office. I was pissed off. I asked him "why the fuck are you bringing them to me, my name isn't on them." He said that Brown had left them in his office and told him to deliver them to me. When Ed McDonough delivered the Ballots to my office they were in a manila folder. The envelopes were open with the ballots inside. There were about thirty ballots in the envelope. McDonough and I went over the voter list. McDonough asked "how many do we have". I tallied in the 40's. This number included the ballots that I had given to Dan Brown on Friday the 11th. I told Ed McDonough that he could probably get Brian Suozzo and Jermaine Joseph as well. I'm sure those two ballots never left the Rensselaer County Board of Elections office. When I say that they never left the Board of Elections office, I mean that applications were made and ballots generated and neither the application or the ballot ever left the BOE for the voter to see. They were forged. I told McDonough that I didn't have time to try to find all of the voters and get signatures on the ballots. I called Michael LoPorto, Clem Campana and John Brown I told all of them that I wasn't going to get all of the ballots signed myself and that I wanted them to meet me at Griswold Heights to get them done. I had plans for the evening, I had to cancel my plans, and I told them that if they wanted the WFP line they were going to have to help. I sent Tony Renna to Jackson St. to get the ballots for Joseph Mamone, Michael Mamone, Michelle Zilligit, and Jessica Boomhower signed. Me, Michael LoPorto, and Clem Campana started soliciting for signatures on the ballots. We did not have much success. I can only say for sure that Richard Gusnlaw signed a ballot. John Brown arrived at some point while we were knocking on doors. I saw Tony Renna hand the four ballots from Jackson St. to John Brown. I was kind of following them and I heard Tony say to John Brown " do you have to do that in front of everyone." I asked John "what the hell are you doing". I believe that the handwriting in the date field on the four ballot envelopes from Jackson St. is John Brown's. I didn't actually see him complete the ballots. We knocked on some more doors, again without much luck. When we finished trying to get signatures I had the ballots with me. We went to our cars and as we were all getting ready to leave one of the three, I can't remember which one, said " these are going in right? " I acknowledged the question with the response " I'm not turning them into the BOE" I Michael LoPorto

told me that he would take care of it.

On Tuesday, September 15th, 2009 I left the ballots that I had received the previous day from Ed McDonough at my home when I went to work. Sometime around mid morning Michael LoPorto called me and asked me if the Ballots "were done yet". I told him no. In my mind I know that I didn't want to forge that many ballots with that many people involved in the plan. I knew that something was going to go wrong. I kept stalling and hoping that Michael or someone would call and say " give them to me and I'll do it." That never happened. Michael called me again just prior to lunch time and asked me again. I told him no again and said that I was busy at work. I hoped he would ask for them, but he didn't. As the day went on I knew that I was going to have to do them because if I didn't, all three of them would know that I did not do it and I felt I would most likely lose my job. Sometime after getting back to the office from my lunch break I went home and forged the ballots and the ballot envelopes. I didn't want my DNA on them so I dipped my finger in water and wet the envelope seals that way. When I completed them I called Michael LoPorto and told him to meet me at City Hall. I gave the ballots to Michael at City Hall. They were in a manila envelope and he left with them.

On the morning of the 15th of September I received a telephone call from either Kevin McGrath or John Brown, I can't be sure who first called. They told me that Bob Mirch and the Deputy Mayor Dan Crawley had been out speaking to the voters who had absentee ballots at the BOE. This was the first indication that there was going to be problems with the election. Later in the day Kevin Mcgrath called me and asked me "how many from my district went in." I told him again that I didn't know.

During the following week Bob Mirch had one of his candidates, Christian Lambertson, initiate a Law suit to invalidate the absentee Ballots for the WFP and to look into the fraud. Ed McDonough came to my office at City Hall. He told me that Bob Mirch had hired a Private Investigation firm to investigate what happened with the absentee ballots. Ed wanted to talk about a "strategy" to deal with the situation. He suggested going to Bob Mirch and trying to make some kind of deal to make the situation go away. I was not on board with going to Mirch. I told Ed he needed to just tell the truth. Ed told me that he was going to meet with the John Brown and some of the WFP people at LoPorto's later that day. I asked Ed if he really thought that it was a good idea to meet with the WFP. Ed and I met in Waterford the night before the civil hearing. I wanted to stay away from home and work so that I couldn't be served with a subpoena and have to testify in the Civil proceeding. It was some time during that week following the Primary that I decided that I needed to protect myself. I called the District Attorney, Rich McNally. Rich and I became friends during the 2007 election cycle when Rich was running for District Attorney and I was working for Party candidates. I told Rich that I needed to speak to him, and that I didn't want to talk on the phone. Rich invited me up to his house in Valley Falls. We spoke on his porch. Rich told me that he had recused himself and had requested a Special Prosecutor. I told Rich that I needed a Lawyer who knew Election Law. Rich told me to hire Jim Long before any one else did. The next day I was in Jim's office and I hired him to represent me. Jim told me to refer any Police that may want to interview me to him.

Once I had an Attorney representing me on the matter things were more quiet for some time. I didn't have much contact, other than City business, with any of the other persons involved in the Ballot Fraud. Sometime after I had heard that Anthony DeFiglio had been interviewed and told what he knew about the Ballot Fraud. I did ask Tony Renna to go and speak to Anthony. I asked Tony to tell Anthony to get a Lawyer and I also told him that we would try to get him some work after the whole Ballot Fraud thing was over. During that same time I received calls from Clement Campana, Michael LoPorto and John Brown. They were all concerned about how much Anthony knew about the Ballot Fraud, and how much he told the State Police. John Brown and his family even went so far as to find Anthony a job in Vermont. I think it was some type of maintenance job at a Motel. I spoke to Ed McDonough on occasions regarding his interviews with the State Police. I told Ed to just tell the truth. Following his first interview with the State Police Ed told me that he had told Inv. Ogden that he had left the ballots "at City Hall. I told Ed that he needed to tell the truth about that because Kevin O'Malley was with him and witnessed everything that happened.

N O T I C E — Penal Law § 210.45 — IN A WRITTEN INSTRUMENT, ANY PERSON WHO KNOWINGLY MAKES A FALSE STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE TO BE TRUE HAS COMMITTED A CRIME UNDER THE LAWS OF THE STATE OF NEW YORK PUNISHABLE AS A CLASS A MISDEMEANOR.

AFFIRMED UNDER PENALTY OF PERJURY

This _____ day of __MONTH,__ 20 ___

OR

SUBSCRIBED AND SWORN TO BEFORE ME

This _80_ day of __MONTH,__ 20 _11_

SIGNATURE OF DEPONENT, WILLIAM A. MCINERNEY

SIGNATURE OF WITNESS

STATEMENT END TIME: _____ AM PM

JAMES E. LONG
Notary Public, State of New York
No. 02LC6037605
Qualified in Albany County
Commission Expires Jan. 3, 20_15_

PAGE 6 OF 6 PAGES

# EXHIBIT 2

1  STATE OF NEW YORK

2  SUPREME COURT                    COUNTY OF RENSSELAER

3  - - - - - - - - - - - - - - - - - - - - - - - - X

4  THE PEOPLE OF THE STATE OF NEW YORK

5  - against -              Indictment #SP11-1002

6  EDWARD MC DONOUGH AND MICHAEL LO PORTO,      51-57 w, Statewd

7           Defendants.

8  - - - - - - - - - - - - - - - - - - - - - - - - X

9  *TRIAL TESTIMONY OF WILLIAM MC INERNEY*

10                      County Courthouse
                        Congress and Second Streets
11                      Troy, New York 12180
                        February 23, 24 and 28, 2012.

12

   B e f o r e:
13
                HONORABLE GEORGE J. PULVER, JR.,
14              Acting Supreme Court Justice.

15  A p p e a r a n c e s:

16              **For the People:**
                TREY SMITH, ESQ., Special District Attorney,
17              Rensselaer County, and MATTHEW C. HUG, ESQ.,
                Special Assistant District Attorney,
18              105 Jordan Road
                Troy, New York.
19
                **For Defendant McDonough:**
20              BRIAN D. PREMO, ESQ.
                20 Corporate Woods Boulevard
21              Albany, New York.

22              **For Defendant LoPorto:**
                MICHAEL A. FEIT, ESQ.
23              383 Clinton Avenue
                Albany, New York.

24              EDWARD MC DONOUGH, Defendant, in person.
25              MICHAEL LO PORTO, Defendant, in person.

                ———— Judy A. DelCogliano ————

1    by that?  What did you take him to mean?

2                MR. SMITH:  Your Honor, I hate to keep

3         objecting, but to continually try to make a connection

4         between me and Mr. McNally because of a friendship is

5         improper.  It's placing an issue of selective prosecution

6         before the jury, as the Court has ruled upon.  I object to

7         it.

8                MR. PREMO:  Your Honor, it is not selective

9         prosecution.  It is malicious prosecution.

10               THE COURT:  Hold on.  The connection has already

11        been made.  It's before the jury, and I'm going to allow

12        the question, which is --

13        Q.    I will ask it again.

14               THE COURT:  And wrap it up very quickly.

15        Q.    Well, what was the conversation in toto with

16   Mr. McNally about that issue?

17        A.    Very brief.  He stated that he liked Eddy and that

18   maybe he should consider getting a second opinion.

19        Q.    So, the DA of the county called you.  Is that what

20   you are saying?

21        A.    He called me.

22        Q.    With no preface to the conversation.  He just called

23   you one day.  Is that right?

24        A.    He called me.  I had just finished refereeing a

25   basketball game.

1    that would get information improperly.

2             MR. PREMO:  Thank you, Judge.

3    Q.   In December of 2010, in fact, you were aware, and it

4    was publically known, that Mr. McDonough intended to testify in

5    the Grand Jury on his own behalf.  Is that right?

6    A.   Correct.

7    Q.   I mean, you knew about that?

8    A.   He told me he was thinking about testifying.

9    Q.   Right.  And it was at that time, exactly at that

10   time, that you contacted my client, Mr. McDonough, and told him

11   that DA McNally was recommending that he get another attorney.

12   Isn't that right?

13   A.   DA McNally had said he liked Eddy and maybe he should

14   consider a second opinion.

15   Q.   Because I wasn't competent; right?

16   A.   No.  He just said that he should consider getting a

17   second opinion.

18   Q.   But he told you he didn't think I was doing any

19   favors, meaning I wasn't competent; right?  Isn't that the gist

20   of it?

21   A.   The word competent didn't come out, no.

22   Q.   So, when Mr. McNally, the DA of this county who

23   recused himself from this case, who is a friend of the

24   prosecutor, told you that he didn't think that I was doing any

25   favors for my client, what, exactly, did you intend him to mean

EXHIBIT 3

STATE OF NEW YORK

SUPREME COURT                    COUNTY OF RENSSELAER

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK

- against -                    Indictment #SP11-1002

EDWARD MC DONOUGH AND MICHAEL LO PORTO,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

*TRIAL TESTIMONY OF WILLIAM MC INERNEY*

                    County Courthouse
                    Congress and Second Streets
                    Troy, New York 12180
                    February 23, 24 and 28, 2012.

B e f o r e:

            HONORABLE GEORGE J. PULVER, JR.,
            Acting Supreme Court Justice.

A p p e a r a n c e s:

            **For the People:**
            TREY SMITH, ESQ., Special District Attorney,
            Rensselaer County, and MATTHEW C. HUG, ESQ.,
            Special Assistant District Attorney,
            105 Jordan Road
            Troy, New York.

            **For Defendant McDonough:**
            BRIAN D. PREMO, ESQ.
            20 Corporate Woods Boulevard
            Albany, New York.

            **For Defendant LoPorto:**
            MICHAEL A. FEIT, ESQ.
            383 Clinton Avenue
            Albany, New York.

            EDWARD MC DONOUGH, Defendant, in person.
            MICHAEL LO PORTO, Defendant, in person.

1    A.   I believe the names -- I believe I spoke to my

2  attorney, and he gave me names, if Eddy was looking for a

3  second opinion.

4    Q.   Politically connected attorneys, so that my client

5  would contact them.  Is that what the purpose was?

6    A.   I don't know if they are politically connected.

7    Q.   And then you gave those names to Mary Sweeney and

8  told Ed to call them.  Is that right?

9    A.   I probably did, yes.

10    Q.   And are you aware that the DA then called my client

11  at the same time and left a message?

12    A.   I wasn't aware that the DA spoke to your client, no.

13    Q.   Are you aware that the chairman of the party then

14  called my client on the same matter and suggested to him that

15  he not testify in the Grand Jury?  Are you aware of that?

16    A.   I am not aware of that.

17    Q.   Are you aware that, at that same time and soon

18  thereafter, that the prosecutor told your attorney that you

19  would not be prosecuted, because there was not sufficient

20  corroboration to prosecute you?  Are you aware of that?

21    A.   Am I aware that the prosecutor told my attorney --

22    Q.   Yes.

23    A.   That there wasn't sufficient evidence for me to be

24  prosecuted --

25    Q.   Yes.

1    A.   -- at that time?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And you are aware that that same proposition was told

5    to you in 2010 and 2011 prior to the time that Mr. McDonough,

6    defending himself, reviewed the Board of Elections documents

7    and gave them to the State Police and the FBI? Is that right?

8              MR. SMITH: I object to the form of the

9         question.

10             THE COURT: No, he can answer.

11             THE WITNESS: Could you repeat that?

12             (Whereupon, the pending question was read back

13        by the Reporter.)

14   A.   I guess so. Until I was charged, I wasn't going to

15   come forward.

16   Q.   Well, in fact, you knew that the prosecutor had told

17   your attorney you were not going to be prosecuted. You knew

18   that?

19   A.   At the time, yes.

20   Q.   And that's, in fact, the way you were acting? In

21   other words, you were out. You were the City Clerk. You were

22   doing your normal, everyday life, while my client was being

23   prosecuted for crimes he didn't commit. You know that; right?

24             MR. SMITH: Your Honor --

25             THE COURT: Sustained. Jury will disregard,

# EXHIBIT 4

STATE OF NEW YORK

SUPREME COURT                          COUNTY OF RENSSELAER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK

- against -                    Indictment #SP11-1002

EDWARD MC DONOUGH AND MICHAEL LO PORTO,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

_TRIAL TESTIMONY OF WILLIAM MC INERNEY_

                         County Courthouse
                         Congress and Second Streets
                         Troy, New York 12180
                         February 23, 24 and 28, 2012.

B e f o r e:

          HONORABLE GEORGE J. PULVER, JR.,
          Acting Supreme Court Justice.

A p p e a r a n c e s:

               **For the People:**
               TREY SMITH, ESQ., Special District Attorney,
               Rensselaer County, and MATTHEW C. HUG, ESQ.,
               Special Assistant District Attorney,
               105 Jordan Road
               Troy, New York.

               **For Defendant McDonough:**
               BRIAN D. PREMO, ESQ.
               20 Corporate Woods Boulevard
               Albany, New York.

               **For Defendant LoPorto:**
               MICHAEL A. FEIT, ESQ.
               383 Clinton Avenue
               Albany, New York.

               EDWARD MC DONOUGH, Defendant, in person.
               MICHAEL LO PORTO, Defendant, in person.

1    Q.   You worked on Mr. McNally's campaign in 2007; did you

2    not?

3    A.   Yes.

4    Q.   And you knew that was a close race in 2007; right?

5    A.   Yeah.

6    Q.   But you are aware, are you not, that Mr. McNally won

7    his election based primarily upon the absentee ballot vote.

8    Are you aware of that?

9    A.   I know he won by a small margin, yes.

10   Q.   In fact, you solicited applications and you solicited

11   absentee ballots on behalf of Mr. McNally in 2007; did you not?

12   A.   I solicited ballots for all the candidates.

13   Q.   And we also now know that many of the ballots that

14   you solicited in 2007, as well as 2008, were forgeries and

15   fraudulent; correct?

16   A.   Correct.

17   Q.   Are you also aware that, when Mr. McNally recused

18   himself, that another friend of Mr. Smith's, Mr. Gruenberg, a

19   local attorney involved in politics, was one of the people,

20   along with Mr. McNally, who recommended his appointment in this

21   case.  Were you aware of that?

22   A.   No, I wasn't.

23   Q.   Did the State Police talk to you about that prospect

24   when they first talked to you about a debriefing and providing

25   cooperation in this case?

# EXHIBIT 5

STATE OF NEW YORK

SUPREME COURT                          COUNTY OF RENSSELAER

3   - - - - - - - - - - - - - - - - - - - - - - - - - X

4   THE PEOPLE OF THE STATE OF NEW YORK

5   - against -                    Indictment #SP11-1002

6   EDWARD MC DONOUGH AND MICHAEL LO PORTO,

7          Defendants.

8   - - - - - - - - - - - - - - - - - - - - - - - - - X

9   *TRIAL TESTIMONY OF WILLIAM MC INERNEY*

10                          County Courthouse
                           Congress and Second Streets
11                         Troy, New York 12180
                           February 23, 24 and 28, 2012.

12

13  B e f o r e:

            HONORABLE GEORGE J. PULVER, JR.,
14          Acting Supreme Court Justice.

15  A p p e a r a n c e s:

16          **For the People:**
            TREY SMITH, ESQ., Special District Attorney,
17          Rensselaer County, and MATTHEW C. HUG, ESQ.,
            Special Assistant District Attorney,
18          105 Jordan Road
            Troy, New York.
19
            **For Defendant McDonough:**
20          BRIAN D. PREMO, ESQ.
            20 Corporate Woods Boulevard
21          Albany, New York.

22          **For Defendant LoPorto:**
            MICHAEL A. FEIT, ESQ.
23          383 Clinton Avenue
            Albany, New York.
24
            EDWARD MC DONOUGH, Defendant, in person.
25          MICHAEL LO PORTO, Defendant, in person.

1    A.   I might have been told but, you know, I don't

2    remember whether I was or whether I wasn't.

3    Q.   In fact, were you ever told that they obtained

4    statements from witnesses in which they discussed the fact that

5    you have included people at bars, that you talk to them at

6    bars; that they sign voter registration cards and then you

7    forge their signatures on applications and ballots?  Were you

8    ever told that?

9    A.   I believe the State Police might have said something

10   to me.

11   Q.   Did they show you any of those documents that day?

12   A.   To the best of my recollection, I don't remember, Mr.

13   Premo.  They may have.  They might not have.

14   Q.   In 2009, after the voter fraud became public, did you

15   ever, in private or in public, threaten to take everyone down

16   if you went down or anything of -- words to that effect?

17   A.   I might have said that, you know, I'm sure that they

18   want me to take the fall.

19   Q.   Well, do you recall telling people, if you go down,

20   everybody is going down?  Do you remember saying that?

21   A.   I don't remember saying that, to the best of my

22   recollection.

23   Q.   Did you, in the last six months, threaten Mr. Peter

24   Ryan with regard to any matter?

25   A.   Not that I remember.