UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL LOPORTO,

                              Plaintiff,

        -against-                                                 1:15-CV-0866 (LEK/DJS)

COUNTY OF RENSSELAER, *et al.*,

                              Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Plaintiff Michael LoPorto commenced this civil rights action against Rensselaer County,

former officials, and several private individuals pursuant to 42 U.S.C. § 1983. Dkt. No. 1

("Complaint").[1] In the Complaint, Plaintiff alleges that defendants Rensselaer, Youel C.

Smith III, Richard J. McNally, Jr., William A. McInerney, John F. Brown, Daniel B. Brown, and

John J. Ogden violated and conspired to violate his rights under the United States Constitution

---

[1]  The first paragraph of the Complaint states that this action is brought pursuant to
42 U.S.C. §§ 1983, 1984, 1985, and 1986. Compl. ¶ 1. Plaintiff's reliance on §§ 1984, 1985, and
1986 is misplaced. "Sections one and two of 42 U.S.C. § 1984 were declared unconstitutional by
the Supreme Court in 1883, and sections three and four were repealed by Congress in 1948."
Dennison v. Pa. Dep't of Corr., 268 F. Supp. 2d 387, 395 n.3 (M.D. Pa. 2003) (citing United
States v. Singleton, 109 U.S. 3 (1883)). Likewise, no subsection of § 1985—or, by extension,
§ 1986—appears relevant to Plaintiff's claims. "Section 1985(1) relates to conspiracies to
interfere with a federal official in the performance of his or her duties," while § 1985(2) prohibits
interference in state proceedings by "force, intimidation, or threat," Butler v. Hesch,
No. 16-CV-1540, 2018 WL 922187, at *20 (N.D.N.Y. Feb. 15, 2018), and a § 1985(3) claim
requires "allegations of racial or other invidious class-based animus," Hernandez v. Goord,
312 F. Supp. 2d 537, 548 n.4 (S.D.N.Y. 2004) (citing United Bhd. of Carpenters and Joiners of
Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828–29 (1983)). Plaintiff makes no such
allegations. In any event, aside from the first paragraph, the Complaint contains no reference to
§§ 1984, 1985, or 1986, and each cause of action is expressly brought pursuant to § 1983 only.
See Compl. ¶¶ 47–100. Therefore, the Court construes the Complaint as alleging claims under
§ 1983.

and federal law. E.g., id. ¶¶ 1–3. Presently before the Court are five motions to dismiss the Complaint for failure to state a claim, Dkt. Nos. 24 ("Browns Motion"), 24-3 ("Brown Memorandum"), 29 ("McNally Motion"), 29-3 ("McNally Memorandum"), 40 ("McInerney Motion"), 40-2 ("McInerney Memorandum"), 57 ("Ogden Motion"), 57-2 ("Ogden Memorandum"), 66 ("Smith Motion"), 66-3 ("Smith Memorandum"), a motion for judgment on the pleadings, Dkt. No. 96 ("Rensselaer Motion"), 96-1 ("Rensselaer Memorandum"), and the Browns' motion for sanctions, Dkt. Nos. 58 ("Sanctions Motion"), 58-2 ("Sanctions Memorandum"). For the reasons that follow, the Sanctions Motion is denied, and the remaining motions are granted.

## II.    BACKGROUND

### A.  Factual Background

The following facts are drawn from the allegations of the Complaint, which are accepted as true on a motion to dismiss. Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her favor").

This action stems from an alleged voter fraud scheme that came to light after the 2009 election in Troy, New York. At that time, Plaintiff, McInerney, and the Browns were "engaged in the political process by assisting the Working Class Party of the City of Troy by passing petitions and absentee voting applications relevant to the election of 2009." Compl. ¶ 16.[2] At some point

---

[2]  It is unclear from the Complaint whether Plaintiff was involved in the Working Class Party or the Working Families Party in 2009. Compare Compl. ¶ 16 (referencing the "Working Class Party of the City of Troy"), with id. ¶ 44 (discussing the "2009 Working Families Party

after the 2009 election, non-party Robert Mirch reported to Defendants and the New York State Police his belief "that forgeries on absentee ballots and absentee ballot applications occurred throughout August and September 2009." Id. ¶ 17. The State Police conducted an investigation, which produced evidence incriminating multiple individuals, including McInerney and the Browns. Id. ¶ 18. The evidence was provided to Rensselaer, the county in which Troy is situated. Id. Once word of the investigation became public, McInerney told "other political party operatives in the [Rensselaer County] Democratic Party," including McNally and the Browns, that "if he were involved in the prosecution, he was going to 'take everyone down with him.'" Id. ¶ 19.

McNally, who was the Rensselaer District Attorney at the time, decided to recuse himself from the voter fraud investigation. Id. ¶ 20. The New York State Supreme Court, Rensselaer County, granted McNally's request even though, according to Plaintiff, McNally provided "no apparent or least stated[] reason" to support his recusal application. Id. The Complaint alleges that McNally actually sought recusal because he

> had reason to suspect that guilty parties involved in the prior elections of 2007 and 2008 and the current election of 2009 were Democratic operatives who had assisted him in his prior elections and had a very good chance of being implicated by a conspiracy of the false, fraudulent and forgery activities during elections in the City of Troy which he either knew of or should have known of in the course of his own candidacy for District Attorney in 2007.

Id. Plaintiff maintains that the recusal was "clearly illegal." Id.

Following McNally's recusal, Smith was appointed Special Prosecutor to investigate the voter fraud allegations. Id. ¶ 21. Smith and McNally had previously worked together in the

_____

primary"). However, that inconsistency is immaterial to the motions presently before the Court.

District Attorney's Office. Id. Plaintiff alleges that McNally "t[ook] steps to have" Smith appointed because he knew "Smith would work with him in making sure that Defendant McInerney and other operatives who assisted him in these type of false, fraudulent and forgery activities in previous elections were not implicated or involved." Id. As a result, "a conspiracy arose at the very beginning of the investigation and administration to cover up false, fraudulent and forgery behavior relative to the elections of 2007, 2008 and 2009 in the City of Troy." Id.

Plaintiff claims that Smith "utilized the false, fraudulent and coerced evidence obtained during his investigation and administration of this voter fraud case" to obtain a twenty-nine count grand jury indictment against Plaintiff. Id. ¶ 24. He further alleges that Defendants conspired to fabricate evidence against him in order to cover up the "clearly guilty activities" of other "Democratic operatives, including" McInerney and the Browns. Id. ¶ 23. In other words, Smith sought to "scapegoat" Plaintiff in order to protect political allies. Id. ¶¶ 23–25.

Ogden, a New York State Police investigator, id. ¶ 15, "uncovered no evidence" incriminating Plaintiff, but "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert" in an effort "to try to pin guilt on" Plaintiff, id. ¶ 29. In the course of their investigation, Smith and Ogden "forged[] and falsely created" affidavits "for the sole purpose of prosecuting the Plaintiff to cover up the obvious guilt of" McInerney and the Browns. Id. ¶ 30. The fabrication of evidence was "part of an unofficial policy allowed to exist, and not protected or instructed against, by" Rensselaer. Id. ¶ 43. Additionally, Smith "and others . . . maliciously gave false statements and information to the press in order to coerce" Plaintiff to plead guilty. Id. ¶ 34.

Smith also learned "that there was a great deal of evidence against" McInerney and the Browns, as well as "other Democratic operatives." Id. ¶ 31. After the State Police uncovered evidence against McInerney and John Brown, Smith "went to the trouble of having his authority as Special Prosecutor extended to" McInerney so he "could soft peddle anything that [McInerney] faced and protect[] [him] from prosecution." Id. ¶ 43.

Despite being recused, McNally "met and consulted" with McInerney about the case, id. ¶ 35, and referred McInerney to an attorney, id. ¶ 37. Plaintiff also alleges that McNally "approached" a witness "in a completely illegal manner," id. ¶ 42, met with Smith to "discuss[] the case," took "custody of evidence and g[ot] DNA reports," told Democratic operatives, including McInerney and the Browns, that they would not be prosecuted, and made public statements supporting Smith and "adverse to" Plaintiff, id. ¶ 49.

Plaintiff was tried twice for crimes connected to the voter fraud scheme, and ultimately acquitted. Id. ¶ 41. Meanwhile, Smith offered McInerney and John Brown a generous plea deal "with no or little jail time." Id. ¶ 43. In connection with that deal, McInerney testified at Plaintiff's second trial, where he "admitted to guilt for forgeries during the 2009 Working Families Party primary," id. ¶ 44. McInerney was ultimately sentenced to ninety days of community service and five years of probation for his role in the scheme. Id. ¶ 45. John Brown received a sentence of six months incarceration, followed by five years of probation. Id.

**B. Procedural History**

Plaintiff commenced this action on July 15, 2015, alleging eight causes of action pursuant to § 1983. Compl. He claims that Defendants "deprived [him] of his civil rights," id. ¶ 47, "maliciously and intentionally deprived [him] of his civil and constitutional rights," id. ¶ 57, and

acted "in violation of federal law," id. ¶ 65. Although not explicitly stated, Plaintiff seems to allege the following claims against Defendants: (1) malicious prosecution, id. ¶¶ 63–69, and conspiracy to maliciously prosecute in violation of the Fourth Amendment, id. ¶¶ 47–55, (2) "negligent investigation," id. ¶¶ 56–62, (3) abuse of process in violation of the Fourteenth Amendment, id., (4) "stigma-plus" defamation in violation of the Fourteenth Amendment, id. ¶¶ 70–78, (5) obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, id. ¶¶ 79–82, (6) unlawful racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., Compl. ¶¶ 88–94, and RICO conspiracy, id. ¶¶ 95–100. Plaintiff also alleges § 1983 municipal liability against Rensselaer under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Compl. ¶¶ 83–87.[3]

Between September and December 2015, the Browns, McNally, McInerney, and Ogden moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Brown Mot.; McNally Mot.; McInerney Mot.; Ogden Mot. The Browns also moved for sanctions in December 2015. Sanctions Mot. Between the end of 2015 and mid-2016, the parties entered into settlement negotiations. But when, in July 2016, those negotiations stalled, Smith also moved to dismiss. Smith Mot.

---

[3] The Complaint appears to allege the Monell claim against all defendants. See Compl. ¶ 84 ("The actions and omissions of the Defendants described herein constitute valid Monell claims against the Defendants . . . ."), ¶ 86 ("Pursuant to [§ 1983], Defendants are jointly and severally liable to Plaintiff in the sum of $5,000,000 . . . ."). Because a Monell claim is a vehicle for seeking relief under § 1983 from a municipality and its instrumentalities, e.g., Owen v. City of Indep., Mo., 445 U.S. 622, 635–36 (1980), the Court construes this cause of action as alleged against Rensselaer only. To the extent Plaintiff seeks to bring a Monell claim against the individual defendants, he fails to state a cognizable claim.

In August 2016, the Court discovered a serious attorney conflict issue. At a settlement conference held on August 12, 2016, it came to light that Plaintiff's attorney, Paul F. Dwyer, had joined the law firm of Cooper Erving & Savage LLP, which represented the Browns. Dkt. No. 83 ("2016 Order") at 2. On November 16, 2016, the Court disqualified Dwyer and Cooper Erving from representation and appearance in this case and stayed the action to allow Plaintiff and the Browns to obtain new counsel. Id. at 7. The Court also afforded Plaintiff and the Browns an opportunity to request additional briefing in the event they determined that their prior attorneys' papers were inadequate. Id.

The Browns did not secure new counsel, opting to proceed pro se. Docket. On January 24, 2017, Plaintiff's new attorney, John J. Sweeney, requested an extension of time in which to "familiarize [him]self with the prior proceedings in the matter." Dkt. No. 89 ("Extension Request"). The Court denied the Extension Request because Sweeney was not admitted to practice in this District. Dkt. No. 90. Two months later, Sweeney, now admitted to appear before the Court, submitted a notice of appearance. Dkt. No. 91. In April 2017, he submitted a seven page supplemental brief in opposition to the pending motions to dismiss. Dkt. No. 93 ("Supplemental Brief"). In June 2017, Rensselaer moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Rensselaer Mot., which Plaintiff opposed, Dkt. No. 97 ("Rensselaer Opposition").

Between June 2017 and August 2018, settlement negotiations resumed. As a result, multiple conferences were held before the Court to discuss the parties' progress and the likelihood of their reaching a settlement. See, e.g., Dkt Nos. 101, 106, 107. At the final such conference, held August 30, 2018 (the "August 2018 Conference"), the parties confirmed that no

settlement would be reached, and the Court informed the parties that motion practice would resume. Dkt. No. 108 ("August 2018 Conference Transcript") at 3. Sweeney then requested that, "should the motions to dismiss be granted," the Court grant Plaintiff "leave for 30 days to refile [his] papers." Id. That request was objected to by Smith's counsel. Id. at 4. Finally, Sweeney informed the Court that he had accepted a position with Rensselaer County and would, therefore, be withdrawing as Plaintiff's counsel. Id. at 3.

## III.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct

based on the pled facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.[4]

## IV.  DISCUSSION

Plaintiff brings this action pursuant to § 1983, which "provides a civil claim for damages against any person who, acting under color of state law, deprives another of the right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

### A.  Malicious Prosecution and Conspiracy Claims

Plaintiff's first claim is for malicious prosecution and conspiracy to maliciously prosecute in violation of the Fourth Amendment, brought pursuant to § 1983. Compl. ¶¶ 47–55, 63–69. When analyzing a malicious prosecution claim under § 1983, a court "adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." Cornejo v. Bell, 592 F.3d 121, 129 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'"

---

[4]  Rensselaer has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Rensselaer Mot. at 1. "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)).

To establish a § 1983 conspiracy, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases). A private party is deemed to have acted under color of state law if he conspires with a state actor to violate a plaintiff's constitutional rights. Charlotten v. Heid, No. 09-CV-891, 2011 WL 3423826, at *11 (N.D.N.Y. Aug. 4, 2011) (Kahn, J.). To survive dismissal, a complaint alleging a § 1983 conspiracy must allege more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." Ciambriello v. Cty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)).

### 1. McNally and Smith

#### a. Eleventh Amendment Immunity

Plaintiff sues McNally and Smith in their official and individual capacities. Compl. ¶¶ 10–11. McNally argues that he is immune from the official capacity claims under the Eleventh Amendment. McNally Mem. at 6–7.

The Eleventh Amendment provides that "[t]he judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court "has consistently held that an unconsenting State is

immune from suits brought in federal courts by her own citizens." Edelman v. Jordan, 415 U.S. 651, 662–63 (1974) (collecting cases). Sovereign immunity is lost when a state explicitly consents to suit or Congress "unequivocal[ly]" abrogates immunity. Chayoon v. Chao, 355 F.3d 141, 143 (2d Cir. 2004). It is well-settled that Congress did not abrogate states' immunity when it enacted § 1983, e.g., Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and New York State has not waived immunity from suit on the claims Plaintiff asserts, e.g., Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 39–40 (2d Cir. 1977). Although Smith does not assert an Eleventh Amendment defense, the Court "may raise the issue of Eleventh Amendment immunity sua sponte." Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ., 466 F.3d 232, 238 (2d Cir. 2006).

"When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir.1988), cert. denied, 488 U.S. 1014 (1989). To the extent he is sued in his official capacity, Smith stands in the shoes of the recused prosecutor. See Aretakis v. Durivage, No. 07-CV-1273, 2009 WL 249781, at *27 (N.D.N.Y. Feb. 3, 2009) (noting that a special prosecutor is "an independent contractor standing in for a recused district attorney"). Therefore, Plaintiff's official capacity claims against McNally and Smith are construed as claims against the State and are thus barred by the Eleventh Amendment. See, e.g., Woodward v. Office of Dist. Atty., 689 F. Supp. 2d 655, 659 (S.D.N.Y. 2010) ("To the extent that [the plaintiff] seeks to assert claims against the District Attorney's Office in federal court, his claims are also barred by the Eleventh Amendment." (citing Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d. Cir. 1993))).

Plaintiff's argument that the Eleventh Amendment does not bar his official capacity claims appears to confuse Eleventh Amendment immunity with prosecutorial immunity. Dkt. No. 43-1 ("McNally Opposition") at 3–5. His claim that "absolute immunity is reserved for officials who perform 'special functions and deserve absolute immunity from civil liabilities,'" id. at 4 (quoting Hill v. City of New York, 45 F.3d 653, 660 (2d Cir. 1995)), has no bearing on whether state actors are immune from a § 1983 damages claim, see Ying Jing Gan, 996 F.2d at 529 ("The availability of immunity under the Eleventh Amendment does not depend on the nature of the function performed by the state."). The issue of absolute versus qualified immunity concerns prosecutorial, not Eleventh Amendment, immunity, and is addressed below.

Because they are barred by the Eleventh Amendment, the official capacity claims against McNally and Smith are dismissed.

### b. *Prosecutorial Immunity*

McNally and Smith's Eleventh Amendment immunity does not extend to those claims brought against them in their individual capacity. See id. ("To the extent that such a claim is asserted against him in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment."). McNally and Smith argue that they are entitled to prosecutorial immunity against Plaintiff's claims against them in their individual capacity. McNally Mem. at 7–8; Smith Mem. at 20–21.

To determine whether a prosecutor enjoys absolute immunity against a claim for damages, courts apply a "'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.'" Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993)). "Prosecutors are entitled to

absolute immunity when they engage in activities 'intimately associated with the judicial phase of the criminal process,' and done 'in the course of [their] role as . . . advocate[s] for the State.'" Kent v. Cardone, 404 F. App'x 540, 542 (2d Cir. 2011) (alterations in original) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976) and Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" Hill, 45 F.3d at 661 (alteration in original) (quoting Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994)). Thus, a prosecutor has absolute immunity from claims seeking damages for "initiating a prosecution and . . . presenting the State's case," Imbler, 424 U.S. at 431, filing a criminal information and procuring arrest warrants, Barr v. Abrams, 810 F.2d 358, 362 (2d Cir. 1987), negotiating a guilty plea, Taylor v. Kavanagh, 640 F.2d 450, 453 (2d Cir. 1981), or entering "an agreement to forgo prosecution in exchange for certain types of concessions," Kent v. Cardone, 404 F. App'x 540, 542 (2d Cir. 2011). In Hill, the Second Circuit concluded that a prosecutor's alleged acts of "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" were "clearly protected by the doctrine of absolute immunity as all are part of his function as an advocate." 45 F.3d at 661.

The initiation of a prosecution is an essential element of a malicious prosecution claim, and so prosecutors are generally immune to malicious prosecution claims. See, e.g., Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005) ("Because the immunity attaches to the official prosecutorial function and because the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions, the prosecutor has absolute immunity for the initiation and conduct of a prosecution unless [he] proceeds in the clear absence of all jurisdiction." (alteration

in original) (internal citations and quotations omitted)); McKeon v. Daley, 101 F. Supp. 2d 79, 87 (N.D.N.Y. 2000) ("[I]t is well-established in the Second Circuit that claims of malicious prosecution of a particular charge are tied to the judicial phase, and warrant absolute immunity for a defendant district attorney." (collecting cases)), aff'd, 8 F. App'x 138 (2d Cir. 2001). Plaintiff's allegation that McNally's disqualification was part of a politically-motivated scheme to scapegoat Plaintiff, Compl. ¶¶ 20–21, does not change the Court's analysis, see Bernard v. Cty. of Suffolk, 356 F.3d 495, 502 (2d Cir. 2004) (concluding that prosecutors' alleged "improper political motive" underlying their "decisions to prosecute plaintiffs and their conduct before the grand jury" was "irrelevant to the applicability of absolute immunity"); see also Peay v. Ajello, 470 F.3d 65, 68 (2d Cir. 2006) ("Plaintiff's claims against [a prosecutor], which encompass activities involving the initiation and pursuit of prosecution [including fabricating evidence and suborning perjury], are foreclosed by absolute prosecutorial immunity, regardless of their alleged illegality.").

Absolute immunity for prosecutorial acts is lost where a defendant "proceeds in the clear absence of all jurisdiction." Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005) (quoting Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987)). Plaintiff asserts that Smith lacked jurisdiction to prosecute him because McNally's recusal was "clearly illegal," thus invalidating Smith's appointment as Special Prosecutor. Smith Opp'n at 4–5; Compl. ¶ 20. Smith was appointed on September 28, 2009 by Justice Robert M. Jacon of the New York Supreme Court, Rensselaer County. Dkt. No. 68-3 ("Appointment Order").[5] Plaintiff alleges that McNally's

---

[5]  Smith submitted the Appointment Order as an exhibit to his Motion. The Court takes judicial notice of the order because it is "integral" to the Complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel.

recusal was invalid because it was based on McNally's belief that the potential targets of the investigation "were Democratic operatives who had assisted him in his prior elections and had a very good chance of being implicated by a conspiracy . . . which [McNally] either knew or should have known of." Compl. ¶ 20. A district attorney in New York may seek recusal "[w]here there is legitimate doubt as to whether a district attorney and his office may proceed with a case." Working Families Party v. Fisher, 15 N.E.3d 1181, 1185 (N.Y. 2014). Plaintiff's allegation that McNally recused himself from the voter fraud case because he feared he or his political allies would be implicated, Compl. ¶ 20, suggests that recusal was reasonable, not unlawful. In addition, because courts "are not bound to accept as true a legal conclusion couched as a factual allegation," Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555), Plaintiff's claim that the recusal was "clearly illegal" is not enough to plausibly suggest the Appointment Order was invalid.

Furthermore, McNally and Smith are entitled to absolute immunity against Plaintiff's conspiracy claim—at least insofar as that claim is brought, in McNally's case, with regard to his pre-recusal behavior—because "it is also well established that absolute prosecutorial immunity extends to conspiracy allegations." Covington v. City of New York, 916 F. Supp. 282, 287 (S.D.N.Y. 1996); see also Dory v. Ryan, 25 F.3d 81, 83 (2d Cir.1994) (holding that absolute prosecutorial immunity from § 1983 liability extends for "allegedly conspiring to present false

---

Co., 62 F.3d 69, 72 (2d Cir. 1995)). Moreover, "[c]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (second alteration in original) (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial").

That said, McNally's post-recusal actions—which included (1) approaching a witness, id. ¶ 42; (2) meeting and consulting with McInerney, Compl. ¶ 35; (3) referring McInerney to an attorney, id. ¶ 37; and (4) meeting with Smith to discuss the case, id. ¶ 49—are not entitled to absolute immunity and could therefore support a conspiracy claim, if they were undertaken in agreement with Smith to further Plaintiff's alleged malicious prosecution. McDonough v. Smith, No. 15-CV-1505, 2016 WL 5717263, at *21 (N.D.N.Y. Sept. 30, 2016) (citing Kulwicki v. Dawson, 969 F.2d 1454, 1467 (3d Cir. 1992), aff'd 898 F.3d 259 (2d Cir. 2018). However, none of those allegations are sufficient, as pled, to give rise to a cognizable claim against McNally and to survive Defendants' motions.

Plaintiff alleges that McNally "in a completely illegal manner, and despite [his] recusal," approached a witness to be called during Plaintiff's second trial. Compl. ¶ 42. However, while Plaintiff claims that McNally's behavior was "illegal, false, fraudulent, and criminal" and made up part of his conspiracy with Smith "to falsely scapegoat prosecute the Plaintiff," id., he neither describes the content of the conversation that occurred between McNally and the witness nor provides any factual support tying that conversation to any alleged conspiracy. Similarly, the fact that McNally "met and consulted with [] McInerney about [Plaintiff's] case," id. ¶ 35, and referred McInerney to an attorney, id. ¶ 37, does not show that McNally engaged in a conspiracy with Smith to maliciously prosecute Plaintiff. Indeed, the Complaint fails to connect those interactions in any way to Smith's prosecution of Plaintiff, and its "conclusory, vague, [and]

general allegations" are insufficient to plausibly show that McNally conspired with Smith to "deprive [Plaintiff] of his constitutional rights." <u>Ciambriello</u>, 292 F.3d at 325.

Plaintiff's allegations that McNally met with Smith to "discuss[ Plaintiff's] case," Compl. ¶ 49, also fail to state a plausible conspiracy claim. "Mere communications between an individual and a prosecutor, without more concrete allegations of wrongdoing, are insufficient to state a malicious prosecution conspiracy claim." <u>McDonough</u>, 2016 WL 5717263, at *21. Therefore, while McNally's contact with Smith may not have been advisable "given the potential appearance of impropriety," such behavior "does not necessarily indicate a conspiratorial agreement." <u>Id.</u>

As a result, the Court concludes that Smith and McNally are entitled to absolute prosecutorial immunity against Plaintiff's malicious prosecution claims, and that McNally's alleged post-recusal actions do not give rise to a cognizable conspiracy claim. Plaintiff's claims against Smith and McNally in their individual capacities are therefore dismissed in their entirety.

### 2. The Browns

Plaintiff also brings claims for malicious prosecution against the Browns. He alleges that the Browns were "engaged in the political process by assisting the Working Class Party of the City Troy by passing petitions and absentee voting applications relevant to the election of 2009," Compl. ¶ 16, and that they participated in the 2009 voter fraud scheme, <u>id.</u> ¶¶ 18, 20, 23, 25–27. The Complaint also alleges that John Brown was eventually convicted for his role in the scheme. <u>Id.</u> ¶ 45. However, the Complaint does not allege that the Browns initiated or played any role in the criminal investigation and proceedings against Plaintiff, or that they did so with malice. The

fact that the Browns allegedly participated in the 2009 voter fraud scheme, id. ¶¶ 20, 23, 25–27,

in no way suggests that they initiated the prosecution against Plaintiff.

Moreover, though Plaintiff alleges that the Browns acted under color of state law, Compl.

¶ 3, nothing in the Complaint indicates that the Browns were state actors or held any position in

local government or law enforcement, compare id. ¶ 10 (alleging that Smith was the Special

District Attorney for Rensselaer County and acted "in his capacity as an agent, servant, and/or

employee of [Rensselaer]"), with id. ¶ 13 (alleging that John Brown "was a resident of the

County of Rensselaer and State of New York"), ¶ 14 (alleging that Daniel Brown "was a resident

of the County of Rensselaer and State of New York").[6] Therefore, Plaintiff's § 1983 malicious

prosecution claim against the Browns must fail. See, e.g., Krug v. McNally, 488 F. Supp. 2d 198,

199 (N.D.N.Y. 2007) (Kahn, J.) ("It is also well settled that in order for a plaintiff to bring a §

1983 claim against a defendant, that defendant must be a State actor, acting under color of State

law." (citing Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir. 1997)), aff'd, 368 F. App'x 269 (2d

Cir. 2010).

Plaintiff has similarly failed to allege a viable conspiracy claim against the Browns. In

opposing the Brown Motion, Plaintiff argues that "there are a myriad of listed facts supporting

the allegation of conspiracy," Dkt. No. 45-3 ("Brown Opposition") at 3, but he fails to provide

---

[6] The Browns state that John Brown was a member of the Troy City Council, and Daniel
Brown, his brother, served as his campaign manager. Brown Mem. at 3. Because these facts are
not alleged in the Complaint, the Court will not consider them in deciding the present motions.
See Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) ("'[W]hen matters outside the
pleadings are presented in response to a 12(b)(6) motion,' a district court must either 'exclude the
additional material and decide the motion on the complaint alone' or 'convert the motion to one
for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present
supporting material.'" (alteration in original) (quoting Fonte v. Bd. of Managers of Cont'l
Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988)).

specific citations to that effect. The Complaint does allege that Smith was aware of "a great deal of evidence against" the Browns, id. ¶ 31, that unspecified individuals entered a conspiracy "to hide and cover up" the misconduct of several Democratic operatives, including the Browns, id. ¶ 26, and that John Brown was eventually convicted for his role in the scheme, id. ¶¶ 43, 45. However, these allegations suggest only that Smith disregarded evidence against the Browns and attempted to conceal their wrongdoing; they do not support an inference that there was a conspiracy between the Browns and Smith (or anyone else, for that matter). Plaintiff does not allege that the Browns discussed the voter fraud investigation with Smith or anyone else, or that they encouraged Plaintiff's prosecution.

The Complaint also states as follows:

> [I]n support of this conspiracy and during the course of this investigation and administration of this case, Defendant Smith, upon information and belief, conspired with the other Defendants once the New York State Police had uncovered overwhelming evidence on their own of the guilt of Defendant McInerney of this forged, false and fraudulent absentee ballot applications and absentee ballots throughout the 2009 election and turn [sic] this overwhelming evidence over to [Rensselaer].

Compl. ¶ 35. Construed in the light most favorable to Plaintiff, that passage seems to indicate that Smith conspired with all of the other named defendants. However, it does not indicate what Smith and "the other Defendants" conspired to do, and does not suggest that they planned to violate Plaintiff's rights. Moreover, Plaintiff's allegation that the "actions and omissions of the Defendants, especially Defendant Smith, . . . constituted a conspiracy to make him a scapegoat prosecution target to cover up and prevent the prosecution of the actual liable parties," id. ¶ 36, is too conclusory to support a § 1983 conspiracy claim. See, e.g., Ciambriello, 292 F.3d at 324 ("A

merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." (citing <u>Spear v. Town of West Hartford</u>, 954 F.2d 63, 68 (2d Cir. 1992))). In any event, the Browns' actions do not "constitute[] a conspiracy," Compl. ¶ 36, because they cannot be classified as overt acts undertaken in furtherance of any agreement.

Therefore, based on the foregoing analysis, the Court will dismiss Plaintiff's malicious prosecution and conspiracy claims as brought against the Browns.

### 3. McInerney

Plaintiff also brings claims against McInerney under § 1983 for malicious prosecution and conspiracy. Specifically, Plaintiff alleges that McInerney (1) was "engaged in the political process by assisting the Working Class Party of the City of Troy by passing petitions and absentee voting applications relevant to the election of 2009," Compl. ¶ 16; (2) participated in the 2009 voter fraud scheme, <u>id.</u> ¶¶ 18, 20, 23, 25–27; (3) told "other political party operatives in the [Rensselaer] Democratic Party . . . [that, if prosecuted,] he was going to 'take everyone down with him,'" <u>id.</u> ¶ 19; (4) testified at Plaintiff's second trial, <u>id.</u> ¶ 43; and (5) "admitted to guilt for forgeries during the 2009 Working Families Party primary," <u>id.</u> ¶ 44, for which he was sentenced to community service and probation, <u>id.</u> ¶ 45. Plaintiff also alleges that McNally "met and consulted with" McInerney about the voter fraud investigation, <u>id.</u> ¶ 35, "referred" McInerney to an attorney, and "g[ave] him advice" "during the course of [this] consultation," <u>id.</u> ¶¶ 37, 49. Finally, the Complaint states that Smith told McInerney that he "would not be prosecuted despite the overwhelming evidence against [him]." <u>Id.</u> ¶ 49.

To the extent Plaintiff bases his claims on McInerney's trial testimony, McInerney enjoys absolute immunity from suit. San Filippo v. U.S. Tr. Co. of N.Y., 737 F.2d 246, 254 (2d Cir. 1984) ("[I]t is settled under Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), that a witness has absolute immunity from § 1983 liability based on the substance of his trial testimony."). A witness's immunity "may not be circumvented by claiming that [the] witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." Rehberg, 566 U.S. at 369. "Were it otherwise, 'a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves.'" Id. (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part)). In any event, Plaintiff does not allege that McInerney provided false testimony or agreed to do so. His claims appear to be premised on the mere fact that McInerney was guilty of voter fraud and testified against Plaintiff. Even if true, these facts do not support a claim for malicious prosecution or conspiracy.

Furthermore, Plaintiff's allegation that a witness met with a prosecutor is not enough to support a claim of conspiracy. There is "nothing suspicious or improper in" meetings between prosecutors and witnesses. Scotto v. Almenas, 143 F.3d 105, 115 (2d Cir. 1998) (quoting San Filippo, 737 F.2d at 256). The "mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them." Id. (alteration in original) (quoting San Filippo, 737 F.2d at 256).

Finally, Plaintiff alleges that, as part of the conspiracy, unidentified individuals "utilized . . . false, fraudulent and coerced evidence, uncovered through the investigation and

administration of this voter fraud case" against him to "hide and cover up the clearly guilty activities of . . . Democratic operatives, including [McInerney and the Browns]." Compl. ¶ 23. However, it is unclear what "false, fraudulent and coerced evidence" Plaintiff is referring to or who "utilized" that evidence against him. The Complaint does not allege that McInerney was involved in gathering, fabricating, or presenting any "false" evidence, nor that he was aware that prosecutors utilized improper methods to protect him at Plaintiff's expense. The fact that Smith decided to prosecute Plaintiff instead of McInerney does not suggest that McInerney encouraged or had any role in the prosecution.

Plaintiff's malicious prosecution and conspiracy claims against McInerney are therefore dismissed.

### 4. Ogden

Plaintiff's malicious prosecution and conspiracy claims against Ogden, who at all relevant times worked as an investigator for the New York State Police, Compl. ¶ 15, appear to be based on his role in investigating the voter fraud scheme. While the Complaint makes several references to the "investigating officers behind the prosecution working . . . at the behest of [Smith]," Compl. ¶ 27, it does not identify who these officers are or explicitly allege that Ogden investigated Plaintiff. However, because the Court must make all reasonable inferences in Plaintiff's favor in deciding a motion to dismiss, it will assume for the purposes of deciding the Ogden Motion that Ogden was one of the officers involved in the investigation.

To support his malicious prosecution and conspiracy claims, Plaintiff alleges that Ogden "uncovered no evidence of the guilt of [Plaintiff] in any forgery or fraud as to absentee voting applications and ballots, or anything else except clearly phony, baseless and contrived

handwriting conclusions, based upon the evidence procured during the investigation and administration of this case." Compl. ¶ 29. The Court construes that language as alleging that the only evidence Ogden found implicating Plaintiff was obviously fabricated. In addition, Plaintiff alleges in the Complaint that Ogden (1) "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert and uncovered and prepared and provided . . . the prosecution false witness testimony statements to try to pin guilt on" Plaintiff, id.; (2) "forged[] and falsely created" affidavits "from witnesses who never signed nor read the affidavits . . . for the sole purpose of prosecuting [Plaintiff] to cover up the obvious guilt of Democratic operatives, including" McInerney and the Browns, id. ¶ 30; and (3) provided "false, coerced, forged and fictitious evidence to [Smith] . . . as part of the conspiracy . . . to prosecute" Plaintiff, id. ¶ 39.

As Ogden correctly notes, Ogden Mem. at 11, he is entitled to Eleventh Amendment immunity to the extent Plaintiff seeks money damages against him in his official capacity as a New York State Trooper, see, e.g., Kostok v. Thomas, 105 F.3d 65, 69 (2d Cir. 1997) ("Although the Eleventh Amendment does not altogether bar suits against states, the range of available remedies is narrow. Any claim for retroactive monetary relief, under any name, is barred." (collecting cases)). Because Plaintiff seeks only compensatory damages and has not requested declaratory or injunctive relief, his official capacity claims against Ogden are therefore barred by the Eleventh Amendment.

To the extent that Plaintiff brings a malicious prosecution claim against Ogden in his individual capacity, Ogden argues that such a claim should be dismissed because, "[w]hile [Plaintiff] alleges that the 'Defendants prosecuted [him] maliciously,' nothing is offered to

explain how Trooper Ogden was involved" in the prosecution. Ogden Mem. at 7. Ogden

describes Plaintiff's allegations regarding the falsification of evidence as "[b]ald assertions

devoid of any factual particularity," because the Complaint includes no "factual allegations as to

what" Ogden "supposedly falsified." Id.

Plaintiff did not respond to Ogden's argument or contend that the Complaint alleges with

sufficient particularity what evidence Ogden allegedly fabricated. See Dkt. No. 59-1 ("Ogden

Opposition") at 11–12 (discussing Plaintiff's malicious prosecution claim). Instead, Plaintiff

simply recites the standard for alleging a malicious prosecution claim several times, then argues

that he has stated a claim because the Complaint alleges that "Ogden did not take any steps to

discontinue the prosecution after learning that there was absolutely no probable cause that

existed, which he clearly had a duty, at least in part, to do." Id. at 12.

The Court agrees with Ogden that Plaintiff has failed to state a claim for malicious

prosecution against him. A police officer "initiates" a prosecution when he swears to and signs a

criminal complaint. Burt v. Aleman, No. 05-CV-4493, 2008 WL 1927371, at *5 (E.D.N.Y.

Apr. 30, 2008) (citing Cox v. Cty. of Suffolk, 827 F. Supp. 935, 938 (E.D.N.Y. 1993)). The

Complaint alleges that Ogden fabricated evidence against Plaintiff and lacked probable cause to

prosecute him, but it does not allege that he signed a criminal complaint or otherwise initiated the

prosecution. On the contrary, Plaintiff alleges that Smith initiated the prosecution. Compl.

¶¶ 24, 49. "Once control of a prosecution has passed to a prosecuting attorney, a police officer

may only be liable for 'continuing' the prosecution if he or she '[insists] upon or [urges] further

prosecution.'" Burt, 2008 WL 1927371, at *5 (alterations in original) (quoting Dirienzo v.

United States, 690 F. Supp. 1149, 1158 (D. Conn. 1988)). Plaintiff makes no such allegation, and

the Complaint makes clear that Smith, not Ogden, controlled the investigation and prosecution. E.g., Compl. ¶¶ 24–36, 49. Therefore, because he has failed to allege that Ogden initiated or continued the prosecution against him, Plaintiff's malicious prosecution claim fails.

Ogden argues that the conspiracy claim should also be dismissed, because the Complaint contains "no allegation that [he] entered into any agreement with the named Defendants and against [Plaintiff's] purported interests." Ogden Mem. at 5. He further argues that Plaintiff's "bald assertion that affidavits were forged or falsified during the criminal investigation" is too vague and general because Plaintiff fails "to provide some factual allegations as to what was supposedly falsified by" Ogden. Id. at 7. In response, Plaintiff contends that he "can sufficiently establish a claim for conspiracy by setting forth ten separate interactions between defendants Smith, McInerney, McNally, J. Brown, and D. Brown, especially if and when Trooper Ogden is himself involved." Ogden Opp'n at 10. He also claims that he "does not need to address specific factual allegations as to the manner in which Trooper Ogden was involved as long as it can be established that he may have been circumstantially involved." Id.

As already noted above, at the motion to dismiss stage, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ciambriello, 292 F.3d at 325 (quoting Dwares, 985 F.2d at 100). A plaintiff must "make an effort to provide some details of time and place and the alleged effect of the conspiracy." Dwares, 985 F.2d at 100 (quotation omitted). He meets this burden by alleging "facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights." Green v.

McLaughlin, 480 F. App'x 44, 46 (2d Cir. 2012) (citing Iqbal, 556 U.S. at 680–81). While "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, [ ] the pleadings must present facts tending to show agreement and concerted action." Dunlop v. City of New York, No. 06-CV-433, 2008 WL 1970002, at *4 (S.D.N.Y. May 6, 2008) (alterations in original) (quoting McIntyre v. Longwood Cent. Sch. Dist, No. 07-CV-1337, 2008 WL 850263, at *11 (E.D.N.Y. Mar. 27, 2008)).

Plaintiff has failed to meet this standard with respect to Ogden. The Complaint contains few specific factual allegations regarding Ogden's conduct, and largely "mashes together vague allegations, not parsed out as to each defendant, in the hopes that it will give rise to a conspiracy claim; it does not." Sanchez v. Hoosac Bank, No. 12-CV-8455, 2014 WL 1326031, at *7 (S.D.N.Y. Mar. 31, 2014). While a "general allegation of conspiracy" can state a plausible claim if "amplified by specific instances of conduct," Hernandez, 312 F. Supp. 2d at 546, Plaintiff's allegations contain no such amplification. He alleges that Ogden "uncovered . . . clearly phony, baseless and contrived handwriting conclusions," Compl. ¶ 29, "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert and uncovered and prepared and provided t [sic] the prosecution false witness testimony statements," id., and "forged, and falsely created" affidavits "from witnesses who never signed nor read the affidavits . . . for the sole purpose of prosecuting [Plaintiff] to cover up the obvious guilt of [other] Democratic operatives," id. ¶ 39. These allegations do not specify what the false "handwriting conclusions" were, why they were "phony," what was untrue about the handwriting expert's statements, who provided false testimony (and what made it false), what forged affidavits were presented, who the affidavits were purportedly from, or what facts were

misstated. Nor can the Complaint's deficiencies be blamed on a lack of knowledge on Plaintiff's part. Given that the allegedly falsified evidence would have been submitted at one of Plaintiff's two criminal trials—or, at the very least, disclosed to Plaintiff's attorney—the Court can assume that Plaintiff had access to it.

As a result, because Plaintiff has failed to specifically plead that Ogden entered an agreement to violate Plaintiff's rights or to describe any specific instances of misconduct sufficient to support an inference of agreement, Plaintiff's conspiracy claim against Ogden is dismissed. See, Dunlop, 2008 WL 1970002, at *3–7 (dismissing a conspiracy claim premised on the defendants' alleged agreement to "'alter, fabricate, and manufacture' false evidence to be used against the plaintiff" because the allegations lacked "sufficient factual details" to state a plausible claim of conspiracy); Brown v. Seniuk, No. 01-CV-1248, 2002 WL 32096576, at *4 (E.D.N.Y. Mar. 25, 2002) (holding that allegations that a prosecutor and police officer conspired "to obtain a conviction at any cost" by "making false statements and falsifying reports, presenting false evidence, giving hearsay testimony" was conclusory and "lack[ed] specific facts that show an agreement among the alleged co-conspirators or that the [i]ndividual [d]efendants acted with a shared purpose or common design").

### B.  Negligent Investigation Claim

Plaintiff's second claim appears to be for negligent investigation. Compl. ¶ 57. In support of this claim, he alleges that "Defendants maliciously, intentionally and willfully failed to properly, appropriately and sufficiently examine the evidence and investigate the facts which they alleged to have supported [his] indictment and prosecution." Id. ¶ 58. Ogden argues that this claim should be dismissed because negligent investigation "is not a recognized cause of action."

Ogden Mem. at 6 (citing Pawlicki v. City of Ithaca, 993 F. Supp. 140, 143 (N.D.N.Y. 1998)). Plaintiff concedes "that a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate care in effecting an arrest," but contends that "those negligence claims can survive if couched in terms of malicious prosecution and false imprisonment, which the claims asserted in [the] [C]omplaint are." Ogden Opp'n at 10.

First, the Court is unaware of any court recognizing a § 1983 negligent investigation claim, and therefore agrees with Ogden that such a claim does not exist. See Pawlicki, 993 F. Supp. at 143 ("Where the negligence alleged is based upon an arrest, a plaintiff must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence.").

As to the arguments raised by Plaintiff in his Ogden Opposition, the Court finds that framing Plaintiff's negligence claim as a malicious prosecution claim would make it duplicative of Plaintiff's third cause of action. Repackaging it as a false imprisonment claim, on the other hand, is not warranted based on the facts alleged in the Complaint and, in any event, would work undue prejudice on Defendants. No defendant has interpreted the Complaint to include a false arrest claim, and the Court agrees that Plaintiff has not pled a claim for false arrest. See also Suppl. Opp'n at 2 (noting that Defendants "have been able to identify each of the claims set forth by [Plaintiff], reflecting fair notice of the allegations the Complaint asserts"). Plaintiff's negligent investigation claims are therefore dismissed.

### C. Abuse of Process Claim

Plaintiff's third claim is for malicious abuse of process in violation of the Fourteenth Amendment. Compl. ¶¶ 63–69. "[A]buse of criminal process is actionable under § 1983 as a denial of procedural due process." Sullivan v. LaPlante, No. 03-CV-359, 2005 WL 1972555, at *3 (N.D.N.Y. Aug. 16, 2005) (citing Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)). The Court "turn[s] to state law to find the elements of the malicious abuse of process claim." Cook, 41 F.3d at 80. "In New York, 'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (quoting Cook, 41 F.3d at 80).

The third element of an abuse of process claim—alleging a "collateral objective"—is where many pleadings fall short. The New York Court of Appeals has explained that "[a] malicious motive alone . . . does not give rise to a cause of action for abuse of process." Curiano v. Suozzi, 469 N.E.2d 1324, 1326–27 (N.Y. 1984). "Accordingly, to state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77.

In Board of Education of Farmingdale Union Free School District v. Farmingdale Classroom Teachers Association, Inc., Local 1889 AFT AFL-CIO, 343 N.E.2d 278 (N.Y. 1975), the New York Court of Appeals discussed the characteristics of collateral objectives that will

support an abuse of process claim. Id. at 283–84. It explained that "[w]here process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party." Id. at 283. "Typical scenarios in which courts in this circuit have sustained a claim of malicious abuse of process involve prosecutions for reasons wholly outside of the initial prosecution." Hoffman v. Town of Southampton, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012), aff'd, 523 F. App'x 770 (2d Cir. 2013); see also Richardson v. N.Y.C. Health and Hosps. Corp., No. 05-CV-6278, 2009 WL 804096, at *16 (S.D.N.Y. Mar. 25, 2009) ("[T]he collateral objectives typically associated with abuse of criminal process are extortion, blackmail or retribution; and those objectives are usually characterized by personal animus." (alteration in original) (quoting Jovanovic v. City of New York, No. 04-CV-8437, 2006 WL 2411541, at *12 n.4 (S.D.N.Y. Aug. 17, 2006))).

Likewise, in Del Col v. Rice, No. 11-CV-5138, 2012 WL 6589839 (E.D.N.Y. Dec. 18, 2012), the plaintiffs properly pled a claim for abuse of process by alleging that the defendants had "started the legal process not only to have [the p]laintiffs wrongfully arrested, which is an improper motive, but also to gain control of [one plaintiff's] claim to [a disputed] patent without properly compensating [him], which is an improper collateral purpose." Id. at *10. The subtle motive-purpose distinction referred to by the Del Col court forms a fundamental pillar of the caselaw in this area. It is widely accepted that "[i]mproper motives in using [a] process do not, without more, constitute a collateral objective, provided the process itself is used for its legitimate purpose. . . . Abuse, therefore, lies not in the synthesis of proper purpose and suspect motive. Improper motive is only abuse when joined with improper purpose." Chamberlain v.

Lishansky, 970 F. Supp. 118, 122 (N.D.N.Y. 1997) (citation omitted); see also Knox v. Cty. of Ulster, No. 11-CV-112, 2013 WL 286282, at *5 (N.D.N.Y. Jan. 24, 2013) ("Where a defendant's objective in initiating an arrest is to prevail on a criminal prosecution, the plaintiff will not prevail on a claim for abuse of process."); Hoffman, 893 F. Supp. 2d at 448 (dismissing an abuse of process claim because the plaintiffs "failed to allege that defendants had a collateral purpose beyond pursuing, and prevailing in, [the] plaintiffs' criminal prosecution"). Thus, the Del Col defendants possessed a collateral objective in violation of the Fourteenth Amendment because the *purpose* of the indictment and arrest they implemented "was to invalidate [the plaintiff's] claim to the patent." Del Col, 2012 WL 6589838, at *10.

Plaintiff alleges that he was criminally prosecuted "for the intentional purpose of covering up the criminal liability" of others, including McInerney, the Browns, "and other Democratic operatives." Compl. ¶¶ 64–65. He argues that this allegation satisfies the collateral objective requirement. Smith Opp'n at 9. However, courts in this Circuit have concluded that allegations that defendants pursued a prosecution in order to "cover up" their own misconduct or protect other bad actors does not satisfy the collateral objective requirement. E.g., Gilliard v. City of New York, No. 10-CV-5187, 2013 WL 521529, at *14 (E.D.N.Y. Feb. 11, 2013) ("At most, Defendants issued the summons with the improver *motive* of 'cover[ing] up their abuse of authority in arresting plaintiff.'" (alteration in original)); Crews v. Cty. of Nassau, No. 06-CV-2610, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) ("Because plaintiffs have merely alleged that defendants were motivated by their desire to cover up their misdeeds, but not that defendants had a purpose other than to prosecute Crews, the abuse of process claim fails."); see also Cabisca v. City of Rochester, No. 14-CV-6485, 2017 WL 4221090, at *6 (W.D.N.Y.

Sept. 21, 2017) (rejecting abuse of process claim premised on the allegation that the defendants commenced a prosecution "to provide some lame excuse for committing their outrageous actions . . . [that] they could not defend in any manner without concocting an offense and crime with which to charge the plaintiff"). As the Second Circuit has explained, "'the falsity of the allegations and defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process' where 'the process was both issued and used for its intended purpose.'" Silver v. Kuehbeck, 217 F. App'x 18, 21 (2d Cir. 2007) (quoting Butler v. Ratner, 619 N.Y.S.2d 871, 873 (App. Div. 1994)).

In light of these cases, the Court concludes that Plaintiff has alleged that Defendants acted with an improper motive in prosecuting him, but he has not pled that they had an improper purpose. Therefore, his § 1983 abuse of process claim fails and is subject to dismissal.

### D. Stigma-Plus Defamation Claim

Plaintiff's fourth claim is for defamation in violation of the Fourteenth Amendment. Compl. ¶¶ 70–78. The Fourteenth Amendment's Due Process Clause prohibits a state actor from depriving a citizen of her life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. It is well settled that "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause to create a cause of action under § 1983." Patterson v. City of Utica, 370 F.3d 322, 329–30 (2d Cir. 2004) (citing Paul v. Davis, 424 U.S. 693, 701 (1976)). "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." Id. at 330 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S.

564, 572–73 (1972)). Such an action is generally referred to as a "stigma-plus" claim, and involves "injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (citing Paul v. Davis, 424 U.S. 693, 701–02, 711–12 (1976)).

Plaintiff alleges that Defendants defamed him by subjecting him to a baseless prosecution, causing his "reputation in the community [to be] destroyed and permanently harmed." Compl. ¶ 73. As a result of Defendants' defamatory statements, Plaintiff's business, "a very successful restaurant in Troy, lost hundreds of thousands of dollars in profits, and is currently under great risk of failure." Id. ¶ 74. However, the Complaint does not allege what the defamatory statements were or who made them, nor does it point to any deprivation of a tangible (i.e., non-speculative) right or property interest.

The Second Circuit has held that "'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) (alteration in original) (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994)). The plaintiffs in Sadallah alleged that the defendants' acts caused "damage not only to their business reputation, but [also the deprivation] of the good will in their business" and "served to discourage customers from availing themselves of the [p]laintiffs' facility." Id. at 38–39 (first alteration in original). The court concluded that allegations of lost income and business reputation did not amount to "the additional state-imposed burden necessary for invoking the 'stigma plus' doctrine." Id. at 38. Such harms, the court explained, "are not 'in addition to' the alleged defamation, but rather are direct 'deleterious effects' of that defamation." Id. (citations omitted).

Like the plaintiff in <u>Sadallah</u>, Plaintiff's stigma-plus claim fails because he has failed to allege a deprivation of tangible liberty interest or property right tied to Defendants' alleged defamatory statements. He is correct that "[a]ll . . . [he] need show here [to survive dismissal] is some allegation of credible evidence of deprivation of a liberty interest and defamation." Smith Opp'n at 10. But Plaintiff's allegation that his business suffered lost profits as a result of Defendants' acts and statements, Compl. ¶¶ 72–74, "does not satisfy the separate and independent 'plus' prong of the 'stigma plus' test," <u>Sadallah</u>, 383 F.3d at 39. Therefore, his § 1983 defamation claim fails and is dismissed.

### E. Obstruction of Criminal Investigation Claim

Plaintiff's fifth claim, that Defendants violated 18 U.S.C. § 1510 by "intentionally obstructing a criminal investigation to scapegoat prosecute [sic] the Plaintiff and to cover up the criminal activities of the Defendants[] and others," Compl. ¶ 80, suffers from several deficiencies.

First, § 1510 only proscribes interference with *federal* criminal investigations. <u>See</u> § 1510 (imposing criminal liability for "[w]hoever willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States"); <u>see also</u> <u>United States v. Abrams</u>, 543 F. Supp. 1184, 1187 (S.D.N.Y. 1982) ("To prove a violation of 18 U.S.C. § 1510, the government must prove beyond a reasonable doubt that [] the defendant wilfully endeavored by one of the means set forth in the statute to prevent the communication of information *relating to a violation of the federal criminal laws*." (emphasis added) (citing <u>United States v. San Martin</u>, 515 F.2d 317, 320 (5th

Cir. 1975))). Because Plaintiff alleges that Defendants obstructed a state investigation, they could not possibly have violated § 1510.

Second, there is no indication that § 1510 creates an individual right that can be enforced through § 1983. The Supreme Court has "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). To determine whether a statutory violation can be enforced through § 1983, a court "must first determine whether Congress *intended to create a federal right*." Id. "'[T]he question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.'" Id. at 283–84 (second and third alterations in original) (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 576 (1979)). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" Id. at 284 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692, n.13 (1979)).

The Court concludes that § 1510 confers no individual rights that may be enforced through § 1983. Section 1510 "was designed to deter the coercion of potential witnesses by the subjects of federal criminal investigations prior to the initiation of judicial proceedings." United States v. San Martin, 515 F.2d 317, 320 (5th Cir. 1975) (quoting United States v. Cameron, 460 F.2d 1394, 1401 (5th Cir. 1972)). Even if the provision created a federal right for witnesses and government informants to be protected from coercion by targets of federal investigations, there is no indication that § 1510 creates any rights for the targets themselves. Moreover, criminal provisions generally do not create private rights. See, e.g., Weinstein v. City of New York, No. 13-CV-6301, 2014 WL 1378129, at *4 (S.D.N.Y. Apr. 8, 2014) ("[T]he Title 18

violations referenced in the Complaint are not actionable. Violations of the Criminal Code do not provide a basis for a civil cause of action, unless the particular provision in question includes an express or implied private right of action." (citing <u>Cort v. Ash</u>, 422 U.S. 66, 79–80 (1975))), <u>aff'd</u>, 622 F. App'x 45 (2d Cir. 2015); <u>Bender v. City of New York</u>, No. 09-CV-3286, 2011 WL 4344203, at *2 (S.D.N.Y. Sept. 14, 2011) (concluding that 18 U.S.C. § 1512 and other federal criminal provisions did not create any private right of action). Plaintiff makes no effort to challenge this conclusion and has not identified any caselaw in support of his contention that he may bring a § 1983 action premised on an alleged § 1510 violation.

Therefore, for the reasons set forth above, Plaintiff's cause of action for obstruction of criminal investigation fails to state a claim and is dismissed.

**F. RICO Claims**

Plaintiff's sixth claim is for RICO violations and RICO conspiracy. Compl. ¶¶ 88–100.[7] "[T]o establish a violation of [RICO], a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." <u>DeFalco v. Bernas</u>, 244 F.3d 286, 306 (2d Cir. 2001). "'Racketeering activity' is broadly defined to encompass a variety of state and federal offenses including, inter alia, murder, kidnapping, gambling, arson, robbery, bribery and extortion. <u>Id.</u> (citing § 1961(1)).

The Complaint purports to allege several predicate acts of racketeering, including the "criminal investigation le[a]ding to prosecution of [Plaintiff]'s federal and civil rights,

---

[7] Plaintiff does not oppose the Rensselaer Motion insofar as it seeks dismissal of his RICO claims against the Rensselaer County, Dkt. No. 97-1 ("Rensselaer Opposition") at 1. Therefore, the Rensselaer Motion is granted with respect to those claims.

obstruction of justice, . . . fabrication of false testimony, . . . fabricating and presenting false evidence and judicial proceedings against [Plaintiff]," and otherwise "aiding the Defendants to avoid prosecution and scapegoat" Plaintiff. Compl. ¶ 90. These allegations generally target the same underlying conduct: Defendants' purported conspiracy to target and criminally prosecute Plaintiff.

As a general matter, "[c]ivil rights violations and injury to reputation do not fall within the statutory definition of 'racketeering activity.'" Bowen v. Oistead, 125 F.3d 800, 806 (9th Cir. 1997) (dismissing RICO claims where the plaintiff alleged a "criminal conspiracy to deprive [him] of his civil rights and to injure his reputation and standing in the community"). Courts have consistently rejected attempts to repackage claims premised on malicious prosecution and fabrication of evidence as RICO claims. See, e.g., Hall v. Tressic, 381 F. Supp. 2d 101, 111 (N.D.N.Y. 2005) ("Malicious prosecution is not considered a predicate act for RICO purposes."); Gee Chan Choi v. Jeong-Wha Kim, No. 04-CV-4693, 2006 WL 3535931, at *9 (E.D.N.Y. Dec. 7, 2006) (dismissing RICO claim because "the indictment and trial were the result of the alleged malicious prosecution by defendants, which is clearly non-RICO conduct"); see also Gamboa v. Velez, 457 F.3d 703, 710 (7th Cir. 2006) ("RICO demands more than a straightforward case of malicious prosecution (such as the case before us) to open up its window to treble damages."); Streck v. Peters, 855 F. Supp. 1156, 1162 (D. Haw. 1994) (concluding that perjury in federal court may qualify as a RICO predicate act, but perjury in state court does not). Therefore, Plaintiff's allegations that Defendants illegally targeted him for criminal prosecution and frustrated the administration of justice to protect their political allies does not amount to racketeering activity under § 1961.

Plaintiff's argument that Defendants engaged in "predicate acts of fraud," Brown Opp'n

at 6; McNally Opp'n at 7–8, does not save his RICO claim. He asserts that Defendants

"fraudulently attempted to avoid their [own] prosecution for obvious multiple criminal acts and

allowed the acts to be placed at the feet of [Plaintiff] who was their scapegoat prosecution target

for their own gain." Brown Opp'n at 6; McNally Opp'n at 8. However, "fraudulent prosecution"

is not the sort of "fraud" targeted by RICO, and does not constitute "racketeering activity" as

defined by § 1961. See § 1961(1) (defining "racketeering activity" to include certain state law

crimes and enumerated federal offenses).[8]

As a result, Plaintiff's RICO claim fails and is dismissed.[9] And, because Plaintiff has

failed to allege a viable RICO claim, his RICO conspiracy claim must also be dismissed. See

Citadel Mgmt., Inc. v. Telesis Tr., Inc., 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000) ("[A] RICO

conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions

are not met." (citing Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1062–63 (2d Cir. 1996))).

**G.  Claims Against Rensselaer**

  *1.  Monell Claim*

---

[8]  Plaintiff did allege the violation of one predicate statutory provision listed in § 1961(1), obstruction of a federal criminal investigation under § 1510. Compl. ¶¶ 83–87. However, as explained above, because he has failed to allege any interference with a *federal* investigation, his § 1510 claim fails and cannot support a RICO claim.

[9]  The Court notes that Plaintiff has failed to comply with Local Rule 9.2, which requires a party asserting a RICO claim to submit a civil RICO statement within thirty days of filing the pleading asserting the claim. L.R. 9.2. However, because his RICO claims are dismissed for failure to state a claim, the Court need not address the Browns' argument that his failure to comply with Rule 9.2 justifies dismissal. Dkt. No. 51 ("Brown Reply") at 9–10.

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691. To establish municipal liability under § 1983, a plaintiff must plead and prove that the deprivation of his constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell, 436 U.S. at 690–91). First, a plaintiff may establish the existence of a municipal policy or custom by showing

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.

McLennon v. City of New York, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016). Thus, a plaintiff "'need not identify an express rule or regulation,' but can show that 'a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.'" Littlejohn v. City of New York, 795 F.3d 297, 314–15 (2d Cir. 2015) (quoting Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004)). "Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).

39

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.'" McLennon, 171 F. Supp. 3d at 94 (quoting Green v. City of Mount Vernon, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y.2015)). "To survive a motion to dismiss a municipal liability claim, 'a plaintiff must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists.'" Id. at 95 (quoting Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)).

Plaintiff raises four arguments in support of his Monell claims. First, he contends that he has adequately alleged the existence of a municipal policy because McNally and Smith's conduct in investigating and prosecuting Plaintiff and non-party Edward McDonough for voter fraud "reflects a pattern of unlawful practices of systemic and ongoing unconstitutional violations." Rensselaer Opp'n at 6. However, the fact that Plaintiff can only point to two allegedly unlawful prosecutions—his own and McDonough's, id. at 5–6—undermines his claims of widespread, systemic wrongdoing and fails to support an inference that Rensselaer had a policy or practice of wrongfully prosecuting criminal defendants. See, e.g., Jones, 691 F.3d at 85 (concluding that evidence of two or three instances in which police officers "abused the rights of black people" fell "far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities"); Giaccio v. City of New York, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding such "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of

municipal liability" (citations and internal quotation marks omitted)); <u>McLennon</u>, 171 F. Supp. 3d at 96 (concluding that six allegations of unlawful searches and seizures was not "so widespread as to constitute a municipal custom"); <u>Tieman v. City of Newburgh</u>, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that thirteen instances of similar excessive force allegations over a four year period failed to plausibly allege a widespread practice).

Second, Plaintiff argues that, as municipal policymakers, McNally's and Smith's actions while investigating and prosecuting Plaintiff constitute municipal policy and "reflect[] a pattern of unlawful practices of systemic and ongoing unconstitutional violations." Rensselaer Opp'n at 6; Compl. ¶¶ 38, 85. However, as explained earlier, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." <u>Baez v. Hennessy</u>, 853 F.2d 73, 77 (2d Cir. 1988), <u>cert. denied</u>, 488 U.S. 1014 (1989). Thus, "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability." <u>Walker v. City of New York</u>, 974 F.2d 293, 301 (2d Cir. 1992) (citing <u>Baez</u>, 853 F.2d at 77).

That said, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." <u>Id.</u> Plaintiff argues that Smith was a county policymaker because he "had authority to supervise the investigation of [Plaintiff] and direct the conduct of other defendants." Rensselaer Opp'n at 6. He also states somewhat vaguely that "Smith's conduct went beyond 'typical prosecutor activities like negotiating pleas, scheduling hearings, and filing affirmation in support or writs.'" <u>Id.</u> (citing <u>Peterson v. Tomaselli</u>, 469 F. Supp. 146 (S.D.N.Y. 2007)). But a prosecutor only acts as a "manager" for the purpose of <u>Monell</u>

41

liability when (s)he performs administrative acts "such as 'workplace hiring, payroll administration, the maintenance of physical facilities, and the like.'" Jones v. City of New York, 988 F. Supp. 2d 305, 316–17 (E.D.N.Y. 2013) (quoting Van de Kamp v. Goldstein, 555 U.S. 335, 344 (2009)). Contrary to Plaintiff's contention, Rensselaer Opp'n at 6, a district attorney is not a "manager" for purposes of municipal liability simply because he supervises an investigation or oversees the acts of others involved in a prosecution. See, e.g., Jones, 988 F. Supp. 2d at 317 (noting that "[t]asks directly connected with the prosecutor's basic trial advocacy and prosecutorial duties—including Brady decisions—should under Van de Kamp be treated as 'prosecutorial conduct'" and concluding that "the training of ADAs in the proper disclosure of exculpatory DNA evidence [because it] is inextricably connected with prosecution of criminal cases"); see also Van de Kamp, 555 U.S. at 344 (explaining that "prosecutorial conduct" includes those tasks that "require legal knowledge and the exercise of related discretion"). At its core, the Complaint challenges the way in which McNally and Smith prosecuted Plaintiff and chose not to prosecute other individuals he claims were involved in the voter fraud scheme. Because this is prosecutorial conduct, McNally and Smith were not acting as county policymakers, and Rensselaer is not liable for their actions.

Third, Plaintiff makes numerous references in the Complaint to Rensselaer's "policy of action and omission," id. ¶ 38, and "long standing unofficial policy of malfeasance," id. ¶ 85, which allegedly resulted in the criminal prosecution of innocent parties. "However, 'policy' is not a magic word. Simply saying it does not make it so." Zherka v. City of New York, N.Y., No. 08-CV-9005, 2010 WL 4537072, at *3 (S.D.N.Y. Nov. 9, 2010), aff'd, 459 F. App'x 10 (2d Cir. 2012). And the Complaint does not contain "sufficient factual matter" to plausibly suggest

that Rensselaer had a policy of violating criminal defendants' rights, whether by fabricating evidence, covering up misconduct, or prosecuting individuals it knew to be innocent. Iqbal, 556 U.S. at 677; see also Zherka, 2010 WL 4537072, at *3 (dismissing claims for municipal liability because the complaint—which stated that the defendant city had "ethnically profil[ed]" the plaintiff and "opened a phony investigative file on [him]"—"fail[ed] to proffer any factual support that would allow the Court to deem the allegations conceivable, let alone plausible").

Though not clearly articulated, a liberal reading of the Complaint suggests that Plaintiff may also be seeking to establish a municipal liability claim under a fourth theory—on the basis that Rensselaer failed to adequately train its prosecutors. See Compl. ¶ 85 (alleging that Rensselaer's acts "amounted to establishing, promoting and allowing a long standing unofficial policy of malfeasance by the Defendant County officials in, among other things, failing to . . . instruct and regulate against it"). As noted above, failure to train or supervise municipal agents can support a claim for municipal liability. E.g., McLennon, 171 F. Supp. 3d at 94. But "where . . . [a municipality] has a training program, a plaintiff must . . . 'identify a specific deficiency in the . . . training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation.'" Wray, 490 F.3d at 196 (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." Okin v. Vill. of

Cornwall–On–Hudson Police Dep't, 577 F.3d 415, 440–41 (2d Cir. 2009) (quoting Canton, 489 U.S. at 390–91).

The Complaint does not satisfy this standard. In it, Plaintiff does not state whether Rensselaer provides any training program to its prosecutors, and, if it does, how that training was inadequate and "closely related to [his] injury, such that it actually caused the constitutional deprivation." Wray, 490 F.3d at 196 (quotation marks omitted). He alleges only that McNally and Smith violated his rights and, therefore, Renssellear must have failed to offer proper instruction to prevent the violation. Such an allegation cannot support municipal liability under § 1983; to hold otherwise would be to effectively impose respondeat superior liability on municipalities in direct contravention of the guidance offered in Monell.

Accordingly, Plaintiff's Monell claims against Rensselaer will be dismissed in their entirety.

### 2. Remaining Claims Against Rensselaer

Plaintiff also alleges that Rensselaer "had direct and vicarious liability for . . . [the] actions and omissions of all of the other Defendants." Compl. ¶ 9; see also id. ¶ 22 ("Throughout these activities of commission and omission, Defendants Smith and McNally acted in the scope of his [sic] employment as an employee of, and District Attorney of the Defendant County who, as a matter of law, was directly and vicariously liable for his [sic] actions of commission and omission."). However, it is well-established that "vicarious liability is inapplicable to . . . [section] 1983 suits." De Ratafia v. Cty. of Columbia, No. 13-CV-174, 2013 WL 5423871, at *8 (N.D.N.Y. Sept. 26, 2013) (alterations in original) (quoting Iqbal, 556 U.S. at 676). Therefore, to

the extent Plaintiff seeks to hold Rensselaer vicariously liable for the conduct of its municipal officials, his claims are not cognizable under § 1983 and must be dismissed.

### H. Sanctions Motion

The Browns have also moved for sanctions against Plaintiff and his former attorney, Dwyer, pursuant to Rule 11(c) of the Federal Rules of Civil Procedure. Sanctions Mot.

Pursuant to Rule 11(b), when an attorney or unrepresented party submits papers to a court, (s)he "certifies that to the best of [his/her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" (1) the submission "is not being presented for any improper purpose," such as harassment or "unnecessary delay," (2) "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and (3) the factual contentions "have evidentiary support or, . . . will likely have evidentiary support after a reasonable opportunity" for discovery. If a "court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). However, a court may not impose monetary sanctions "against a represented party for violating Rule 11(b)(2)," which concerns the legal claims and defenses asserted. Fed. R. Civ. P. 11(c)(5)(A).

Rule 11 "is targeted at situations 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.'" Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993) (quoting Associated Indem. Corp. v. Fairchild Indus., 961 F.2d 32, 34 (2d Cir. 1992). "When divining the point at which an argument turns from merely losing to losing and sanctionable," the Second Circuit has "instructed district courts to resolve all doubts in favor of the signer." Id. (quoting Associated Indem., 961 F.2d at 34–35). "Even if the district court concludes that the assertion of a given claim violates Rule 11, however, the decision whether or not to impose sanctions is a matter for the court's discretion." Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004).

The Browns argue that sanctions are warranted here because Plaintiff's "[c]ounsel failed to conduct a reasonable inquiry into the validity of the legal claims asserted against Defendants, and their likelihood of success, as well as to the underlying factual and legal contentions upon which [Plaintiff's] claims were based." Sanctions Mem. at 1. They describe the Complaint as "a classic example of frivolous litigation sanctionable under Rule 11." Id. at 12. However, while the Browns seek sanctions against both Plaintiff and Dwyer, their arguments focus exclusively on the attorney's conduct. See id. ("Plaintiff's Counsel breached his Rule 11 obligations by failing to conduct a reasonable inquiry into the facts to support the allegations asserted in the Complaint."); id. at 13 ("Plaintiff's Counsel breached his Rule 11 obligations by failing to conduct a reasonable inquiry into the law to support the claims asserted in the Complaint."). Because the Browns have not identified any acts by Plaintiff that they believe are sanctionable, it would be improper to award sanctions against him.

46

As to the sanctions requested against Dwyer, the Court finds that, though the Complaint fails to allege sufficient facts to state a claim against the Browns and several of Plaintiff's claims are not legally cognizable, sanctions are not warranted in this case. In light of the Court's duty to resolve "any and all doubts" in the favor of the party opposing Rule 11 sanctions, Rodick, 1 F.3d at 1350, the Court concludes that there was "some arguable basis for" commencing this action, Perez v. Posse Comitatus, 373 F.3d 321, 326 (2d Cir. 2004). The Sanctions Motion is therefore denied.

## I. Leave to Amend

During the August 2018 Conference, Plaintiff's counsel requested that, should the Court decide to grant Defendants' motions to dismiss, Plaintiff be granted an opportunity to "refile [his] papers." Aug. 2018 Conference Tr. at 3. Smith's counsel objected to the request. Id. at 4. In the weeks following the August 2018 Conference, however, neither Plaintiff nor Defendants submitted any filings regarding Plaintiff's request.

Rule 15 of the Federal Rules of Civil Procedure commands that "[t]he court should freely give leave [to amend] when justice so requires." Therefore, when a complaint is dismissed for the first time pursuant to Rules 12(b)(6) or 12(c), leave to amend before reviewing the proposed amended pleading should typically be withheld only if amendment would be futile—namely, if it is clear from the facts alleged that the events in question cannot give rise to liability and would not withstand a subsequent motion to dismiss. Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ("As a matter of procedure, when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted." (citations omitted)); see also In re Aluminum Warehousing Antitrust

Litig., 833 F.3d 151, 157 (2d Cir. 2016) (discussing affirmance of dismissal without leave to amend due to futility); Orchard Hill Master Fund Ltd. v. SBA Commc'ns. Corp., 830 F.3d 152, 156 (2d Cir. 2016) (noting that denial of leave to amend on futility grounds is subject to de novo review); Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 191 (2d Cir. 2015) (holding that, by not allowing plaintiffs to submit a new pleading attempting to correct any deficiencies, the district court "violated the liberal spirit of Rule 15" (quoting Williams v. Citigroup, Inc., 659 F.3d 208, 214 (2d Cir. 2011))).

Bearing in mind its foregoing analysis, the Court finds that allowing amendment of most of Plaintiff's claims would prove futile, because no amendment would allow them to survive a motion to dismiss. However, there are certain claims that, if pled with more particularity, *may* prove sufficiently plausible to give rise to liability. The Court will therefore grant Plaintiff forty-five days to move to amend his pleadings only insofar as they relate to his claims of (1) conspiracy against McNally; (2) malicious prosecution and conspiracy against the Browns; (3) conspiracy against McInerney; and (4) malicious prosecution and conspiracy against Ogden. Once Plaintiff has so moved, Defendants may respond and the Court can assess the proposed amendments' viability and the other factors governing leave to amend.[10] The Court will not consider or allow any attempts by Plaintiff either to replead any of his other claims or to plead additional claims not mentioned in the original Complaint.

---

[10] Plaintiff should note that any motion to amend he may choose to file must comply with the Local Rules, L.R. 7.1(a)(4), and must fully address the deficiencies identified in this Memorandum-Decision and Order. Should he fail to comply with any of those requirements, Plaintiff's motion will be denied and his claims dismissed with prejudice. See, e.g., Burrowes v. Combs, 124 F. App'x 70, 71 (2d Cir. 2005) (affirming the district court's dismissal without further leave to amend after a previous amendment was unsuccessful).

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Brown Motion (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED**, that the McNally Motion (Dkt. No. 29) is **GRANTED**; and it is further

**ORDERED**, that the McInerney Motion (Dkt. No. 40) is **GRANTED**; and it is further

**ORDERED**, that the Ogden Motion (Dkt. No. 57) is **GRANTED**; and it is further

**ORDERED**, that the Smith Motion (Dkt. No. 66) is **GRANTED**; and it is further

**ORDERED**, that the Rensselaer Motion (Dkt. No. 96) is **GRANTED**; and it is further

**ORDERED**, that the Sanctions Motion (Dkt. No. 58) is **DENIED**; and it is further

**ORDERED**, that if Plaintiff wishes to proceed with his (1) conspiracy claims against McNally; (2) malicious prosecution and conspiracy claims against the Browns; (3) conspiracy claim against McInerney; and (4) malicious prosecution and conspiracy claims against Ogden, he must file a motion to amend his complaint, in accordance with the Local Rules, within **forty-five days** from the date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that if Plaintiff fails to timely file a motion to amend as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED with prejudice** without further order of this Court; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     September 24, 2018
                Albany, New York

Lawrence E. Kahn
U.S. District Judge